NATHAN KIMMEL, INC.; Nathan
Kimmel, LLC; KNF Corp., for-
merly known as Kennedy

Nylon Film Corp., Plaintiffs–
Appellants,

v.

DOWELANCO, Defendant–Appellee.

No. 99–56746.

United States Court of Appeals,
Ninth Circuit.

Submitted June 6, 2001.*

Filed Jan. 7, 2002.

---

* John Ashcroft is substituted for his predeces-
sor, Janet Reno, as Attorney General of the
United States. Fed. R.App. P. 43(c)(2).

* The panel unanimously finds this case suitable
for decision without oral argument. *See* Fed-
eral Rules of Appellate Procedure 34(a);
Ninth Circuit Rule 34–4.

Joel R. Bennett, Bennett & Fairshter, LLP, Pasadena, California, for the appellants.

Dean T. Barnhard, Barnes & Thornburg, Indianapolis, Indiana, for the appellee.

Before: HUG, TROTT, and W. FLETCHER, Circuit Judges.

## ORDER AND OPINION

TROTT, Circuit Judge:

### ORDER

The Opinion filed on July 10, 2001, and reported at 255 F.3d 1196 (9th Cir.2001), is withdrawn.

The panel as constituted above has voted to grant the petition for rehearing without further oral argument and to issue a new opinion. With this decision and action, the previous opinion filed July 10, 2001, becomes inoperative, and the pending petition for rehearing en banc becomes moot. The parties, should they so choose, are at liberty to file new petitions with respect to the new opinion.

So ORDERED.

### OPINION

### OVERVIEW

The district court dismissed Nathan Kimmel, Inc.'s (Kimmel) complaint on the ground that its state law claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y. Kimmel appeals this decision. The district court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

### DISCUSSION

**1. Background**

Defendant–Appellee DowElanco is the manufacturer of Vikane, a pesticide used to exterminate termites. Vikane is regulated by the Environmental Protection Agency ("EPA") and must carry an EPA-approved label. The Vikane label contains, among other things, instructions on the proper use of the pesticide. The use of

Vikane in a manner inconsistent with its label is a violation of federal law.

Vikane is commonly used to fumigate areas containing food and medicine. The Vikane label states that when fumigating such areas, all food and medicine should either be removed from the area or placed in special protective bags. DowElanco owns the trademark for one such protective bag, known as Nylofume. DowElanco has licensed the use of the Nylofume trademark to M&Q Plastics Products ("M&Q"), which manufactures and sells the Nylofume bags. Prior to 1993, Dow-Elanco conducted tests on several brands of protective bags to determine their effectiveness during a Vikane fumigation. Of the various bags tested, the Nylofume bag produced by M&Q allegedly was proven to offer the *least* protection.

From 1993 to 1996, the Vikane label read, in part:

Food, feed, drugs, and medicinals ... must be removed from the fumigation site or sealed in highly resistant containers such as glass, metal or double bagging with nylon polymer bags (such as Nylofume,™ Fumebag,™ or Reynolon HRF.™ These protective bags are available only from distributers of this product.)

This label did not restrict the use of other nylon polymer bags not expressly listed on the label.

In early March of 1994, Kimmel informed DowElanco of its intention to begin manufacturing nylon polymer bags for use with Vikane. The bag produced by Kimmel, which is similar to the Nylofume bag, is called the NK–6 bag. DowElanco allegedly responded to Kimmel's announcement of a competitive product by stating that Kimmel would "never be selling bags and [would] not ... be in the bag business much longer" because "you guys have really been a thorn in our side."

Immediately thereafter, on March 7, 1994, DowElanco informed M&Q, the maker of the Nylofume bag, that "[d]ue to some recent discrepancies, our product specimen label for Vikane gas fumigant will now list Nylofume bags as the only option for bagging food during a fumigation." The alleged "discrepancies" were never identified. Three days later, Dow-Elanco wrote a letter to Kimmel stating that because of "the approval of the EPA of certain bag types tested ... [and] Dow-Elanco's liability associated with the Nylofume bag, they will remain the only approved bag on the label."

Approximately one month *after* issuing this statement to Kimmel, DowElanco applied to the EPA to change the Vikane label to require the use of *only* Nylofume bags during a Vikane fumigation. DowElanco informed the EPA that this proposed change was predicated on DowElanco's conclusion that the Nylofume bag had "proven to be the most reliable" and had "proven to be best suited for this use," a conclusion that allegedly was not only unsupported, but actually contradicted by DowElanco's testing. The EPA approved DowElanco's proposed amendment to the Vikane label in October of 1996, thereby prohibiting the use of Kimmel's NK–6 bags during Vikane applications. On January 1, 1998, the State of California began citing and fining any fumigator using non-Nylofume bags during Vikane fumigations.

Kimmel subsequently sued DowElanco, alleging that DowElanco knowingly and intentionally submitted false and misleading statements to the EPA regarding the reliability of the Nylofume bag for the purpose of procuring a Vikane label that would exclude Kimmel from the nylon polymer bag market. DowElanco moved for summary judgment, which was denied by the district court. The district court

did, however, order Kimmel to amend certain portions of its complaint. Kimmel then filed an amended complaint seeking (1) injunctive relief pursuant to California Business and Professional Code § 17200 for unfair business practices, and (2) damages for intentional interference with a prospective economic advantage. The only relief sought by Kimmel under § 17200 was injunctive relief. Specifically, Kimmel asked that DowElanco be ordered to change its label to permit the use of the NK–6 bag during Vikane fumigations. As now conceded by Kimmel in its opening brief, however, "an injunction imposed against a manufacturer to change its label would represent a state-mandated labeling requirement and would therefore be preempted." Therefore, the district court's dismissal of this claim is *affirmed.*

DowElanco moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), asserting preemption by FIFRA. The district court granted DowElanco's motion to dismiss.

## 2. FIFRA Preemption

■ The gravamen of Kimmel's state damages claim for intentional interference with a prospective economic advantage is that DowElanco knowingly submitted false information to the EPA to obtain an amended Vikane label prohibiting the use of NK–6 bags during Vikane fumigations.[2] On appeal, Kimmel challenges the district court's conclusion that this claim is preempted by FIFRA.

### a. *Standard of Review*

■ We review de novo both a dismissal for failure to state a claim under Rule 12(b)(6) and the district court's decision regarding preemption. *See Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.2000).

### b. *Analysis*

■ The Supremacy Clause of the Constitution provides that any state law conflicting with federal law is preempted by the federal law and is without effect. U.S. Const. art. VI, cl. 2. "In determining whether federal law preempts a state statute, we look to congressional intent. Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday,* 498 U.S. 52, 56–57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (internal quotations omitted). The Supreme Court has held that principles of implied conflict preemption serve to nullify state law that "under the circumstances of th[e] particular case ... stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress— whether that 'obstacle' goes by the name of conflicting; contrary to; ... repugnance; difference; irreconcilability; inconsistency; violation; curtailment; ... interference, or the like." *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (inter-

---

**2.** As its threshold argument, DowElanco asks that we dismiss this appeal due to the procedural inadequacies of Kimmel's brief. We do not believe that such a severe sanction is warranted in this case. Our conclusion is based upon (1) Kimmel's efforts to rectify its procedural blunders, and (2) the fact that the uncured defects in Kimmel's brief—including its omission of the appropriate standard of review and its failure to provide a summary of its argument—do not excessively hinder our ability to resolve this appeal. *See Big Bear Lodging Assoc. v. Snow Summit, Inc.,* 182 F.3d 1096, 1106–07 (9th Cir.1999) ("[t]his court has imposed the ultimate sanction of dismissal only in egregious cases of noncompliance").

nal quotations omitted). Implied conflict preemption can exist even when Congress has chosen to include an express preemption clause in a statute. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

The federal law claimed by DowElanco to preempt Kimmel's state damages claim is FIFRA. FIFRA is a comprehensive regulatory scheme aimed at controlling the use, sale, and labeling of pesticides. *See Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 601, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). FIFRA requires, among other things, that manufacturers register a pesticide with the EPA before introducing it into the market. As part of this registration process, manufacturers must submit to the EPA a proposed label for approval. *See* 7 U.S.C. § 136a(c)(1)(C) (West 2000). FIFRA specifically prohibits the knowing falsification of any application for the registration of a pesticide, including the falsification of "any information relating to the testing of any pesticide ... including the nature of any ... observation made, or conclusion or opinion formed." *Id.* at §§ 136j(a)(2)(M), 136j(a)(2)(Q).

In § 136v of FIFRA, Congress expressly delineated the extent to which the States can regulate pesticides:

(a) In General

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v. Both DowElanco and Kimmel focus primarily on this express preemption language, debating whether Kimmel's state law claim threatens to impose a "requirement for labeling or packaging in addition to or different from" those required under FIFRA. We need not determine the exact length of the preemptive shadow cast by the express language in § 136v, however, because ordinary conflict preemption principles dictate that Kimmel's state law claim is *impliedly* preempted by FIFRA.

We base our conclusion today largely on the Supreme Court's recent holding in *Buckman Co. v. Plaintiff's Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). The plaintiff-respondent in *Buckman,* Plaintiff's Legal Committee ("PLC"), represented patients purporting to have sustained injuries resulting from the use of orthopedic bone screws in the pedicles of their spines. *Id.* at 343, 121 S.Ct. 1012. PLC brought suit in state court, alleging that Buckman Co., the regulatory consultant used by the screw manufacturer to navigate the federal regulatory process, made fraudulent representations to the Food and Drug Administration ("FDA") in the course of obtaining approval to market the screws. These fraudulent statements, PLC claimed, were a "but for" cause of injuries sustained by the plaintiffs: "Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." *Id.* Buckman Co. defended against the allegations by contending that PLC's state-law claims were preempted by federal law, specifically, by the federal Food, Drug, and Cosmetic Act (FDCA) as amended by the Medical Device Amendments of 1976(MDA).

The Court began its discussion in *Buckman* by noting that the plaintiffs' claims were not of a nature sufficient to invoke a

presumption against preemption. The Court based this conclusion on the well-worn principle that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 347, 121 S.Ct. 1012 (internal quotations omitted). Applying this proposition to the facts before it, the Court noted that Buckman Co.'s dealings with the FDA had been prompted by the MDA, and that the representations made by Buckman Co. had been dictated by that statute's provisions. *Id.* at 347–48, 121 S.Ct. 1012. Thus, the Court concluded, "in contrast to situations implicating federalism concerns and the historic primacy of state regulation of matters of health and safety, no presumption against pre-emption obtains in this case." *Id.* at 348, 121 S.Ct. 1012(internal quotations omitted).

Given this analytical framework, the Court held that PLC's state-law fraud-on-the-FDA claims resulting in private injuries conflicted with, and therefore were impliedly preempted by federal law. *Id.* The conflict, the Court stated, arose from the fact that the MDA empowers the FDA to pursue a variety of options aimed at punishing and deterring fraud against that agency, and that these options afford the FDA the flexibility necessary for the FDA to balance difficult, and often competing, statutory objectives. *Id.* at 348–51, 121 S.Ct. 1012. This balance, the Court opined, would be skewed by allowing fraud-on-the-FDA claims under state tort law.

The Court further explained that "fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs," thereby needlessly prolonging the application process beyond what Congress had envisioned. *Id.* at 351, 121 S.Ct. 1012.

The *Buckman* Court concluded that, in addition to interfering with the FDA's regulatory duties, state-law fraud-on-the-FDA claims would impose significant burdens on *applicants* seeking FDA approval that had not been anticipated by Congress. *Id.* at 350, 121 S.Ct. 1012 ("As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the FDCA and the MDA."). These burdens, the Court held, militated in favor of its conclusion that the plaintiffs' claims were impliedly preempted by the MDA.

The rationale articulated by the Supreme Court in *Buckman* applies with equal force to the facts before us and compels a similar result. Because Kimmel's state law claim hinges upon its contention that DowElanco committed fraud against the EPA—which is hardly "a field which the States have traditionally occupied"—we undertake our analysis in this case free from any presumption against preemption. *Id.* at 347, 121 S.Ct. 1012.

Just as the MDA prohibits applicants from submitting false information to the FDA, FIFRA expressly forbids applicants from falsifying "any information relating to the testing of any pesticide ... including the nature of any ... observation made, or conclusion or opinion formed." 7 U.S.C. § 136j(a)(2)(Q); *see also* 7 U.S.C. § 136j(a)(2)(M) ("It shall be unlawful for any person to knowingly falsify all or part of any application for registration...."). Moreover, just as Congress made available to the FDA regulatory enforcement mechanisms under the MDA, Congress has af-

forded the EPA substantial enforcement powers under FIFRA that enable the EPA to make a measured response to suspected fraud against it. For instance, the EPA has elaborate internal hearing and appellate review procedures to determine whether a registrant has violated any provision of FIFRA, including violations of FIFRA's statutory prohibition against the knowing submission of false information to the EPA. *See, e.g.,* 40 C.F.R. §§ 22.1, *et seq.;* 40 C.F.R. §§ 179.3, *et seq.* If a violation of FIFRA or its implementing regulations is found to have occurred, the EPA may impose substantial civil and criminal penalties. 7 U.S.C. § 136l(a), (b). Furthermore, the United States Attorney is statutorily authorized to enforce such penalties on behalf of the EPA, and to otherwise prosecute any violation of FIFRA or its implementing regulations. *See* 7 U.S.C. §§ 136l(a)(5), 136g(c)(1). As was the case in *Buckman,* the above "statutory scheme amply empowers the [EPA] to punish and deter fraud against the [Agency], and ... this authority is used by the [Agency] to achieve a somewhat delicate balance of statutory objectives. The balance sought by the [Agency] can be skewed by allowing fraud-on-the-[EPA] claims under state tort law." *Buckman,* 531 U.S. at 348, 121 S.Ct. 1012. *See also Taylor AG Industries v. Pure–Gro,* 54 F.3d 555, 561 (9th Cir.1995) (" '[I]t is for the EPA Administrator, not a jury, to determine whether labeling and packaging information is incomplete or inaccurate, and if so, what label changes, if any, should be made.... We think FIFRA leaves states with no authority to police manufacturers' compliance with the federal procedures.' ") (quoting *Papas v. Upjohn Co.,* 985 F.2d 516, 519 (11th Cir.) *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993)).

The challenge in deciding this case arises from the Supreme Court's opinion in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In that case, the Supreme Court held that the federal Medical Device Amendments of 1976 did not preempt a state common-law negligence action against the manufacturer of an allegedly defective medical device. The reason for this holding as explained in *Buckman* was that "the *Medtronic* claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA [Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 (1994 ed. and Supp. IV)] requirements." *Buckman,* 531 U.S. at 352, 121 S.Ct. 1012. The Court distinguished *Medtronic* from the case presented in *Buckman* by noting that Buckman's

> ... fraud claims exist solely by virtue of the FDCA disclosure requirements. Thus, although *Medtronic* can be read to allow certain state-law causes of action that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim.

*Buckman,* 531 U.S. at 352–53, 121 S.Ct. 1012.

The key factor identified by the Supreme Court in concluding that Buckman's claims were pre-empted was that "the existence of these federal enactments is a critical element in their case." *Id.* at 353, 121 S.Ct. 1012. Because we believe that the existence of the FIFRA requirements are similarly a critical element of Kimmel's state-law case for intentional interference with prospective business advantage, we agree with the district court's disposition of this case. It is the alleged fraud-on-the-EPA and abuse of the labeling process which give rise to Kimmel's damaged business claims and to his proffered cause of action.

In reaching our conclusion today we are cognizant of the potential problems inherent in allowing a state court (or a federal court interpreting state law) to ascertain the propriety of disclosures made by an applicant to a federal agency in response to the mandates of federal legislation. In particular, we are troubled that an applicant's disclosures under FIFRA, although not challenged by the EPA (the very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law. Such an approach would force FIFRA applicants to ensure that their disclosures to the EPA would satisfy not only the standards imposed by that agency under federal law, but also the potentially heterogeneous standards propounded by each of the 50 States. Such a holding would in turn motivate potential applicants under FIFRA to "submit a deluge of information that the [EPA] neither wants nor needs, resulting in additional burdens on the [EPA's] evaluation of an application." *Id.* at 351, 121 S.Ct. 1012. This outcome would needlessly drain the EPA of its limited resources, thereby detracting from its ability to efficiently enforce FIFRA.

 There is one final loose end in this controversy. Kimmel has directed our attention in support of its argument against preemption to a brief filed in 1999 by the EPA as amicus curiae in the Supreme Court of California in the case of *Etcheverry v. Tri–Ag Service, Inc.*, 22 Cal.4th 316, 93 Cal.Rptr.2d 36, 993 P.2d 366 (2000). In that case, the plaintiffs sued the manufacturer of a pesticide for damage to a walnut crop, alleging negligence, strict liability, products liability, breach of implied warranty, and trespass. In its brief, the EPA took the position that FIFRA does not preempt state-law actions for damages that address "the efficacy of pesticides." To quote the brief, "Even if FIFRA could be read to preempt some state damages actions, it cannot be read to

preempt tort actions addressing the efficacy of pesticides." The brief continues: "Even if FIFRA could be read to preempt state damages actions challenging the claims on pesticide labels regarding efficacy, it does not preempt damages claims challenging off-label statements."

The California Supreme Court found the EPA's position in the main both unsupported by the relevant law and unpersuasive in its substance, noting that the EPA's views went against the holdings of eight federal circuit courts of appeal. *Etcheverry*, 993 P.2d at 367. That court did acknowledge a state/federal partnership in the regulation of pesticide efficacy and phototoxicity, but stated that this "does not mean ... that the regulation may be accomplished through the back door by means of tort suits that effectively require changes in EPA-approved labeling." *Id.* at 376. Thus, the court concluded that Etcheverry's claims involving labeling were preempted. Normally, we accord substantial deference to the views of the agency responsible for the administration of a federal program such as FIFRA. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, however, we respectfully decline to accept Kimmel's construction of the brief for three reasons.

First, the *Etcheverry* case and Kimmel's case are substantially and materially different. Kimmel's case has nothing to do with pesticide efficacy and everything to do with fraud-on-the-agency in connection with what appears on product labels.

Second, the EPA's brief was conceived and drafted before *Buckman* was decided, rendering its analytical underpinnings obsolete and suspect.

Third, our own post-*Buckman* analysis in this case leads us to conclude that the EPA would be wrong if it were here to expand its non-preemption views in con-

nection with pesticide efficacy to cases involving fraud-on-the-agency labeling allegations. Accordingly, we do not find the EPA's brief in *Etcheverry* persuasive on the question presented in this case.

## CONCLUSION

For the foregoing reasons, we conclude that Kimmel's state law claims would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting FIFRA, and therefore are preempted by that federal statutory scheme. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

We note in closing, however, as did the district court, that the EPA's amicus brief in this case indicates that Kimmel may be able to bring an administrative action within the EPA or might sue the EPA itself under the Administrative Procedures Act. Thus, our conclusion here does not leave any aggrieved party without an avenue, where appropriate, to seek redress.

AFFIRMED.