**Susan CHAMBERLAN; Brian Champine; and Henry Fok, on behalf of themselves and all others similarly situated, and on behalf of the general public, Plaintiffs,**

**v.**

**FORD MOTOR COMPANY, and Does 1 through 100, inclusive, Defendants.**

**No. C 03–2628 CW.**

United States District Court, N.D. California.

March 24, 2004.

Michael Francis Ram, Heather Marie Mills, Levy, Ram, Olson & Rossi LLP, San Francisco, CA, David G. Wirtes, Jr., Gregory B. Breedlove, R. Edwin Lamberth, Richard T. Dorman, Cunningham, Bounds, et al., Mobile, AL, for Plaintiffs.

Brian C. Anderson, Barton S. Aronson, Matthew Shors, Michael E. Stamp, O'Melveny & Myers LLP, Washington, DC, Troy M. Yoshino, Steven Edward Swaney, O'Melveny & Myers, San Francisco, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

WILKEN, District Judge.

Defendant Ford Motor Company has filed a motion to dismiss Plaintiffs' claims on the ground of preemption. Plaintiffs oppose this motion. The matter was heard on October 17, 2003. Having considered all of the papers filed by the parties and oral argument on the motion, the Court denies Defendant's motion.

## BACKGROUND

Plaintiffs bring this action on behalf of themselves and all similarly situated persons residing in California who purchased certain automobiles (Subject Automobiles)[1] manufactured by Defendant. In relevant part, the complaint alleges that, beginning in 1996, Defendant manufactured, sold, and distributed Subject Automobiles containing defective intake manifolds. Compl. at ¶ 2. Plaintiffs allege that no later than January 1, 1997, and possibly earlier, Defendant became aware that a large number of intake manifolds in the Subject Automobiles were cracking prematurely, exposing drivers and their passengers to serious risk of injury. *Id.* at ¶ 4. Plaintiffs allege that Defendant's testing and records showed that the intake manifolds failed at a "much higher rate than was to be expected from a properly functioning manifold, and was occurring much more quickly than the expected life of the part." *Id.* at ¶ 5.

Starting in January, 1998, Defendant began to offer several extended warranty protection, or "recall," programs for free replacement or repair of the defective intake manifolds for some of the Subject Automobiles. *Id.* at ¶ 6. Plaintiffs allege, however, that Defendant extended this offer almost exclusively to fleet purchasers of Subject Automobiles such as taxi cab companies, limousine companies, and police forces. *Id.* Plaintiffs allege that by failing to send the recall letter or offer the recall program to the vast majority of consumer purchasers of Subject Automobiles, Defendant "concealed from and/or failed to disclose to Plaintiffs and the Class the defective nature of the intake manifolds contained in the Subject Automobiles." *Id.* at ¶ 7. As a result of these defective intake manifolds, the Subject Automobiles purchased by Plaintiffs and the Class "did not perform in accordance with the reasonable expectations of Plaintiffs and the Class-namely, that the automobiles were suitable for normal use as a passenger vehicle." *Id.* at ¶ 8.

The complaint alleges that Plaintiff Brian Champine bought a 1996 Ford Thunderbird on September 13, 2000 and the intake manifold cracked on March 28, 2002 at about 88,000 miles. *Id.* at ¶ 12. Plaintiff Susan Chamberlan bought a used 1997 Mercury Grand Marquis. In June, 2002, the intake manifold in her car cracked at about 60,000 miles. *Id.* at ¶ 13. Plaintiff Henry Fok bought a used 1998 Mustang GT convertible, and in March, 2003, the car's intake manifold cracked at 70,000

1. Subject Automobiles include Mercury Grand Marquis (1996–2001), Ford Mustang (1996–2001), Ford Explorer (2002), Ford Crown Victoria (1996–2001), Lincoln Town Car (1996–2001), Mercury Cougar (1996–1997), and Ford Thunderbird (1996–1997).

miles. *Id.* at ¶ 14. Plaintiffs allege that Defendant, "through its own efforts and through its network of authorized dealerships acting as its agents . . . warranted, advertised, distributed, and sold its automobiles throughout the state of California." *Id.* at ¶ 16.

Plaintiffs' claim under the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 *et seq.* alleges that Defendant engaged in "unfair competition or unlawful, unfair or fraudulent business practices in violation of the Unfair Business Practices Act when [it] omitted to disclose that the Subject Automobiles have defective intake manifolds." *Id.* at ¶ 34.

## PROCEDURAL HISTORY

On August 6, 2003, this Court granted Defendant's motion to dismiss Plaintiffs' UCL claim because the restitutionary relief requested was unavailable under the facts as alleged in the complaint and granted Plaintiffs leave to amend their UCL claim. In their amended UCL claim, Plaintiffs seek "[a]n order temporarily and permanently enjoining Defendants from continuing the unfair business practices alleged" in their complaint. Defendant now seeks to dismiss Plaintiffs' amended UCL claim on the ground that it is preempted.

## LEGAL STANDARD

### I. Motion to Dismiss

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal of a complaint can be based on either the lack of a cognizable legal theory or the lack of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990).

All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Where a State law claim is preempted by federal law, that claim must be dismissed for failure to state a claim because the claimant cannot prove any set of facts that will support the claim for relief. *Kent v. Daimlerchrysler Corp.,* 200 F.Supp.2d 1208, 1212 (N.D.Cal.2002).

### II. California's UCL

The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 [2] (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof.Code § 17200.

The UCL provides for monetary relief in the form of restitution as well as injunctive relief:

> "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

Cal. Bus. & Prof.Code § 17203.

### III. Preemption

Under the Supremacy Clause, State law that conflicts with federal law has no ef-

2. Chapter 1 prohibits false advertising for a variety of businesses.

fect. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)(citing U.S. Const. art. VI, cl. 2). Federal preemption of State law may be express or implied. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). "[W]ithin Constitutional limits Congress may preempt state authority by so stating in express terms." *Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Absent explicit preemptive language, there are two types of implied preemption, field preemption and conflict preemption. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

Courts will find a State law field-preempted if one of three circumstances exist. First, State law is preempted where "Congress' intent to supercede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it." *Pacific Gas and Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (internal quotations omitted). Second, courts will find State law field-preempted if "the Act of Congress [ ] touch[es] a field in which the federal interest is so dominant that the federal system [can] be assumed to preclude enforcement of state laws on the same subject." *Id.* Finally, State law will be field-preempted where "the object sought to be obtained by the federal law and the character of the obligations imposed by it may reveal" that the purpose of the law is to occupy the field entirely. *Id.*

"[W]here Congress has not entirely displaced State regulation in a specific area, State law will still be preempted to the extent that it actually conflicts with federal law." *Id.* Thus, "[C]onflict pre-emption . . . turns on the identification of [an] actual conflict." *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 884, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (internal quotations and citation omitted)

There are two reasons courts will find State law conflict-preempted. First, State law will be conflict-preempted where it is "impossible for a private party to comply with both state and federal requirements." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Second, State law will be conflict-preempted where that law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). There must be "clear evidence" of such a conflict. *Geier,* 529 U.S. at 885, 120 S.Ct. 1913. Speculative or hypothetical conflict is not sufficient: only State law that "actually conflicts" with federal law is preempted. *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608.

Congressional intent is the "ultimate touchstone" of any preemption analysis, express or implied. *Gade v. Nat'l Solid Wastes Management Ass'n,* 505 U.S. 88, 96, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). In determining Congressional intent to preempt, a court must "begin with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose," *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), because "[t]he first and most important step in construing a statute is the statutory language itself." *Royal Foods Co., Inc. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1106 (9th Cir.2001) (citing *Chevron USA v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). As the Court explained in

*Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002), the "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." 537 U.S. at 62–63, 123 S.Ct. 518.

There is a presumption against implied preemption of State law in areas traditionally regulated by the States. *California v. ARC Am. Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). In addressing the question of preemption in a field traditionally occupied by the States, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *Hillsborough County, Florida v. Automated Med. Lab. Inc.,* 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting *Jones,* 430 U.S. at 525, 97 S.Ct. 1305). "In other words, we are not to conclude that Congress legislated ouster of [a State] statute ... in the absence of an unambiguous congressional mandate to that effect." *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146–47, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). The presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (internal quotations omitted).

## DISCUSSION

### I. Presumption Against Preemption

The parties disagree as to whether a presumption against preemption applies in this case. Their disagreement arises from their differing definitions of the field in question. Defendant defines the field as that of recalls and argues that States have not, and the federal government has, played a significant role in administering safety-related motor vehicle recalls. Defendant argues that such a remedy did not exist prior to the 1974 amendments which added recall provisions to the Motor Vehicle Safety Act (MVSA), 49 U.S.C. §§ 30101, *et seq.* so this could not be an area of traditional State police power in which the presumption against preemption applies.

Plaintiffs define the field in question more generally as motor vehicle safety. They point out that the remedy they seek may fall short of a recall. In support of a presumption against preemption, Plaintiffs cite *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) for the proposition that a presumption against preemption applies to cases dealing with motor vehicle safety because of the historical primacy of the States in regulating health and safety. Plaintiffs' opposition also may be read to argue that the field in question is fraudulent business practices.

The claim for which Plaintiffs seek relief arises in the fields of motor vehicle safety and fraudulent or unfair business practices. Motor vehicle safety is an area of traditional State police power. *City of Columbus v. Ours Garage and Wrecker Serv.,* 536 U.S. 424, 439, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). In fact, "[i]n no field has ... deference to state regulation been greater than that of highway safety regulation." *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 443, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978). Even if the injunctive relief Plaintiffs request constitutes a recall, it is a remedy rather than a substantive field of regulation. In *Locke,* the Court drew a distinction between remedies and substantive regulation in the

context of deciding a preemption question. 529 U.S. at 108–09, 120 S.Ct. 1135.

In *Kent*, the court applied the presumption against preemption in a case involving a motor vehicle recall, stating that the field in question was one "which the States have traditionally occupied." *Kent*, 200 F.Supp.2d at 1213 (citing *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240). There is authority in other circuits which supports *Kent's* conclusion by indicating that States historically have provided injunctive remedies in the field of vehicle safety. *See, e.g., Noel v. United Aircraft Corp.*, 342 F.2d 232, 242 (3d Cir.1964); *Braniff Airways Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451, 453 (2d Cir.1969).

Fraud and unfair business practices are also areas traditionally regulated by the States. *Florida Lime and Avocado Growers, Inc.*, 373 U.S. at 145–46, 83 S.Ct. 1210; *ARC Am. Corp.*, 490 U.S. at 101, 109 S.Ct. 1661.

The Court therefore finds that a presumption against preemption applies in this case.

II. Field Preemption

Defendant concedes that there is no express preemption at issue in this case but argues for implied preemption through federal occupation of the field. As noted above, Defendant defines the field in question as motor vehicle recalls. Defendant asserts that the level of detail in the recall provisions of the MVSA and the lack of a provision for any private right of action leading to a judicial recall remedy in the statutory scheme show Congress' intent to occupy the field so as to preclude alternative State remedies.

This Court has found that the fields at issue in this case are motor vehicle safety and fraudulent business practices, and that the presumption against preemption applies. To meet its burden of showing that State law in these areas is field-preempted, Defendant must demonstrate clear and manifest Congressional intent to this effect. Defendant has failed to carry its burden.

As the Supreme Court instructed in *Morales* and *Sprietsma*, the Court must first examine the plain language of the MVSA to determine if Congress had preemptive intent. *Morales*, 504 U.S. at 383, 112 S.Ct. 2031; *Sprietsma*, 537 U.S. at 62–63, 123 S.Ct. 518. The preemption and savings clauses of the MVSA provide:

> (b)(1) ... When a motor vehicle safety standard is in effect under this chapter, a State or political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this Chapter.
>
> ....
>
> ... (d) ... [a] remedy under those sections [that deal with notification requirements and enforcement thereof] and sections 30161 [providing judicial recourse for manufacturers to challenge an adverse agency decision] and 30162 [dealing with petitions for new standards and investigations] of this title is in addition to other rights and remedies under other laws of the United States or a State.
>
> (e) ... Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law.

(b)(1),(d),(e).

The plain language of 49 U.S.C. § 30103(b)(1) indicates that States are not precluded from enforcing motor vehicle safety laws, so long as those laws do not impose a standard different from one explicitly provided in the MVSA. Nonetheless, Defendant argues that Plaintiffs can pursue only the administrative remedy of petitioning the Secretary with regard to

the manifold defect they allege. However, 49 U.S.C. § 30103(d) states that State law remedies remain for a manufacturer or consumer in addition to the administrative proceedings at the National Highway and Traffic Safety Administration (NHTSA) provided for in the MVSA. That section specifically notes, as a non-exclusive remedy, § 30162, which states the administrative procedure through which interested persons may file petitions with the Secretary of Transportation requesting that the Secretary investigate whether to issue an order requiring notice of and a remedy for defective equipment. Thus, it is clear that Congress intended to leave open to consumers State remedies in addition to the administrative petition process. Even if the relevant field were recalls, because this savings clause also makes particular reference to notification and recall provisions as non-exclusive remedies, Defendant's argument that State law in this area is field-preempted runs contrary to the plain language of the statute.

The language of the MVSA thus supports the holding that Congress did not intend the Act to occupy the entire field of motor vehicle safety, much less that of fraudulent business practices, so as to invalidate all State law in these fields.

The weight of authority also supports the conclusion that the MVSA does not occupy the field so as to preempt State motor vehicle safety law. In *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir.2000), the Eighth Circuit held that "Congress in the Safety Act plainly did not intend to occupy the field of motor vehicle safety." Similarly, in *Richards v. Michelin Tire Corp.*, 786 F.Supp. 959, 963 (S.D.Ala.1992), the court held that the statutory scheme of the MVSA "does not evince an intent to reserve the entire field of automotive safety regulation to the federal government." 786 F.Supp. at 963. The *Richards* court noted, "Lawsuits involving automotive defects are common in modern tort law. [But] in the nearly twenty-six years since its enactment, the [MVSA] has never been held to completely occupy the field of [automotive safety] regulation." *Id.* Likewise in *Amrhein v. Quaker Oats Co.*, 752 F.Supp. 894, 896–97 (E.D.Mo.1990), the court held that neither the plain language nor the legislative history of the MVSA supported a holding that the Act completely occupied the field of motor vehicle safety.

Legislative history also demonstrates that Congress did not intend to supplant all other law in the motor vehicle safety field: "[W]e have preserved every single common law remedy that exists against a manufacturer for the benefit of a motor vehicle purchaser." 112 Cong. Rec. 19,663 (1966). The Senate Report addressing the MVSA stated that a role would remain for State enforcement after enactment. Under a section entitled "effect on state law," Senate Report No. 89–1301 explained the impetus behind the MVSA and the legislation's impact on other laws:

> State standards are preempted only if they differ from Federal standards applicable to the particular aspect of the vehicle or item of vehicle equipment (sec.104).... Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.

1966 U.S.C.C.A.N. 2709, 2720 (1966).

Legislative history shows that Congress did not intend the MVSA to be a pervasive scheme, but rather intentionally left certain areas of safety regulation to the States. For example, the MVSA only addresses defect notification procedures for first-time purchasers and warranty transferees, 49 U.S.C. §§ 30117, 30118, and

these purchasers and transferees are protected only for a limited time: manufacturers need only provide free repair or replacement of a defective part if the vehicle or equipment "was bought by the first purchaser more than 10 calendar years ... before notice is given under section 30118(c) or an order is issued under section 30118(b) whichever is earlier." 49 U.S.C. § 30120(g). The MVSA's scope within the field of motor vehicle safety is thus limited because it leaves to State regulation the protection of indirect purchasers and those holding a vehicle beyond the time limitations in the Act. Through this scheme, Congress expressed its intent that "States ... play a significant role in the vehicle safety field by applying and enforcing standards over the life of the car." Senate Report No. 89-1301, 1966 U.S.C.C.A.N. 2709, 2720 (1966).

Thus the plain language of the MVSA, case law, and legislative history all support the conclusion that Congress did not intend to supplant all State regulation of motor vehicle safety.

Defendant argues for Congressional preemptive intent on the basis of the level of detail and "comprehensiveness" of the MVSA's provisions. In support of its argument, Defendant cites the warning in *Locke,* 529 U.S. at 106, 120 S.Ct. 1135, against giving broad effect to a savings clause where doing so would upset a careful federal regulatory scheme. This argument is insufficient to demonstrate field preemption. In *Geier,* the Court explained that the weight of a "volume and complexity" argument differs when asserted in support of a claim of field preemption as opposed to conflict preemption. *Geier,* 529 U.S. at 884, 120 S.Ct. 1913. When applied to the former, "the Court has looked for a specific statement of preemptive intent" as well. *Id.* (citing *Hillsborough,* 471 U.S. at 717, 105 S.Ct. 2371). As the Court pointed out in *Hillsborough,* "the subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *Hillsborough,* 471 U.S. at 717, 105 S.Ct. 2371 (citing *New York Dept. of Soc. Serv. v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973)). Further, as Plaintiffs point out, *Locke's* warning against giving broad effect to a savings clause comes in the context of a case involving interstate navigation, an area of long-standing federal primacy, whereas the fields at issue in the instant case are motor vehicle safety and fraudulent business practices, both areas of traditional State regulatory primacy. *Locke* is therefore inapposite.

Defendant's reliance on *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation,* 153 F.Supp.2d 935, 943 (S.D.Ind.2001) (*Bridgestone I*), in support of its field preemption argument mischaracterizes the holding of that case. In clarifying its earlier dismissal of recall claims, the court in *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation,* 256 F.Supp.2d 884, 899 (S.D.Ind.2003) (*Bridgestone II*), explained that it had dismissed the plaintiffs' claims in *Bridgestone I* on the basis of conflict, not field, preemption. In the words of the court, "[n]othing in the [MVSA] demonstrates a Congressional intent to completely preempt all claims relating to motor vehicle safety." *Bridgestone II,* 256 F.Supp.2d at 899.

The Court therefore denies Defendant's motion to dismiss on the ground of field preemption.

III. Conflict Preemption

Defendant argues for conflict preemption of State injunctive remedies to avoid frustration of Congress' objectives. In

support of its argument, Defendant first asserts that Congress' main goal in enacting the MVSA was to ensure uniform federal oversight of motor vehicle defect notification and correction and then argues that the comprehensiveness of the MVSA and the absence of explicit provision of judicial remedies therein indicates Congressional intent to preclude such remedies.

Again, because a presumption against preemption applies in this case, Defendant bears the burden of showing that it was Congress' "clear and manifest" intent to preempt State law. *ARC Am. Corp.,* 490 U.S. at 101, 109 S.Ct. 1661. Were there no presumption against preemption in this case, Defendant would still need to demonstrate "clear evidence of conflict" to support its theory that State law is preempted. *Geier,* 529 U.S. at 885, 120 S.Ct. 1913.

1. Frustration of Congressional Objective of Uniformity

Defendant's first argument for conflict preemption, that allowing Plaintiffs to pursue their State law claims would frustrate the Congressional objective of uniform administration of recalls, mischaracterizes Congress' intent in enacting the MVSA. As the Second Circuit pointed out in *Chrysler Corp. v. Tofany,* 419 F.2d 499, 508 (2d Cir.1969), "[t]he clearest possible expression of legislative purpose is provided in the first section of the Act itself: 'the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.' 15 U.S.C. § 1381." Congressional reports support the conclusion that safety is the primary purpose of the MVSA.

> In discussing the promulgation of standards, the Senate Commerce Committee stated that it intended "that safety shall be the overriding consideration in the issuance of standards under this bill." [S.Rep. No. 1301 at 2714]. The Conference Report which accompanied the final version of the Senate bill describes the Act as one "to provide for a coordinated national safety program and establishment of safety standards for motor vehicles in interstate commerce to reduce accidents involving motor vehicles and to reduce the deaths and injuries occurring in such accidents." Conf. Rep. No.1919 at 2731.

*Tofany,* 419 F.2d at 508. "Although Chrysler stresses that Congress decreed uniformity, the clear expression of purpose in section 1381 and the other evidence of legislative intent indicate that the reduction of traffic accidents was the overriding concern of Congress." *Id.*

Similarly, in *Buzzard v. Roadrunner Trucking,* 966 F.2d 777, 783 (3d Cir.1992), the Third Circuit held that State common-law tort claims for defective design of an illumination system were not preempted by the MVSA. The court rejected the defendant's argument that the common law action was preempted because it would frustrate the MVSA's goal of uniformity. *Id.* The court explained:

> It remains our view, as it was in *Pokorny [v. Ford Motor Co.,* 902 F.2d 1116 (3d Cir.), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990) ], that uniformity was merely a secondary concern to Congress when it enacted the Safety Act. Accordingly, uniformity cannot take precedence over Congress's primary goal of safety, nor can it defeat Congress's intent, as set out in section 1397(k) of the Act to permit state common law to develop more stringent design requirements in the interest of increased safety. Strict uniformity may even interfere with the safety goal, thus frustrating the Act's purpose. Because of the differences in geography and population among the states, varying standards and requirements may be necessary to achieve the same level of safety

in different states. See *Tofany,* 419 F.2d at 511. The common law development of those standards is properly left to the courts of those states. Therefore, even though state common law may have some negative effect on uniformity, it is not preempted.

*Buzzard,* 966 F.2d at 783–84.

Thus, the primary congressional objective behind the MVSA is safety. While legislative history demonstrates a federal interest in uniformity of motor vehicle safety regulation and administration of recalls, uniformity is at best a secondary goal. Allowing consumers to pursue State remedies for a dangerous manifold defect would likely advance the federal interest in highway safety. Under such circumstances, "some negative effect on uniformity," *Buzzard,* 966 F.2d at 783–84, is not sufficient to constitute the "clear evidence of conflict" with congressional goals required by *Geier* for conflict preemption, much less to overcome the presumption against preemption by demonstrating Congress' "clear and manifest" intent to preempt State law. *ARC Am. Corp.,* 490 U.S. at 101, 109 S.Ct. 1661.

Airbag cases, such as *Geier,* do not support an assertion of conflict preemption due to frustration of the Congressional intent to achieve uniformity because they hold State claims preempted on the basis of an actual conflict with specific, explicitly enunciated safety standards. Instead, "*Geier* teaches that the implied preemption question requires careful analysis of whether a particular common law claim would conflict with, or stand as an obstacle to accomplishing the purposes of, a particular Safety Act standard..." *Harris v. Great Dane Trailers, Inc.,* 234 F.3d. at 400. The Supreme Court's holding in *Geier* that State airbag claims were preempted was based on a detailed analysis of actual conflict between the claims at issue and a specific federal safety regulation promulgated thereunder. 529 U.S. at 883, 120 S.Ct. 1913.

The plaintiffs in *Geier* claimed that "to be safe, a car must have an airbag." This claim conflicted with the express purpose of a federal regulation authorized by the MVSA, Federal Motor Vehicle Safety Standard (FMVSS) 208, which "sought a gradually developing mix of alternative passive restraint devices." 529 U.S. at 886, 120 S.Ct. 1913. The *Geier* Court examined the legislative and regulatory history of FMVSS 208 and concluded that the choice of safety equipment the regulation provided was the result of the Department of Transportation's carefully considered policy decision to allow gradual introduction of safety devices better to meet safety needs and accommodate manufacturers and the public. *Id.* at 875–81, 120 S.Ct. 1913. As the result of a considered policy choice, under FMVSS 208, manufacturers had no duty to install airbags at the time they manufactured the plaintiffs' car, yet the *Geier* plaintiffs' tort claims relied upon precisely such a duty. *Id.* at 881, 120 S.Ct. 1913. The Court held that allowing a State law tort claim to proceed under these circumstances would in effect impose a safety standard upon manufacturers different than that imposed by the Department of Transportation's well-considered regulation. *Id.* *Geier* is distinguishable because there is no substantive regulation at issue in the instant case nor is there language in the MVSA or its legislative history demonstrating that exclusive federal agency administration of injunctive remedies in the field of motor vehicle safety was the considered policy choice of Congress.

2. Interference with the Goal of Providing an Exclusive Federal Remedy

Defendant contends that State law remedies for motor vehicle defects are con-

flict-preempted because the discretion vested in the Secretary of Transportation under the MVSA and the scope and detail of the Act's recall provisions demonstrate Congress' intent that these provisions be the exclusive avenue to a recall or equivalent remedy. Defendant asserts that, by not including a judicially administered remedial scheme under the MVSA, Congress indicated its intent that agency action should be mandatory in the first instance and that judicial intervention into the administrative scheme should not be allowed. Defendant argues that Plaintiffs' claim, which it characterizes as a claim for a recall, frustrates congressional objectives because it conflicts with the methods established in the recall provisions of the MVSA.

As discussed previously, Plaintiffs do not necessarily seek a court-initiated recall. The plain language of Plaintiffs' complaint indicates that they seek an unspecified injunctive remedy possibly consisting of uniform notification or inclusion of individual California vehicle owners in Defendant's voluntary fleet recall already underway. The scope of the remedy that Plaintiffs seek is also limited by the reach of the UCL in that they purport to represent only California owners of the subject vehicles.

Defendant argues that § 30162 of the MVSA supports conflict preemption on the basis of exclusive delegation. Section § 30162 provides in relevant part:

> (a) ... any interested person may file a petition with the Secretary of transportation requesting the Secretary to begin a proceeding ... (2) to decide whether to issue an order under section 30118(b) of this title.

Section 30118(b) authorizes the Secretary to decide, after any interested persons have had the opportunity to present information and express their views, whether a defect exists. If the Secretary decides there is a defect, he or she is authorized to order manufacturers to notify consumers and remedy it. 49 U.S.C. § 30118(b). Neither of these sections contains mandatory language to the effect that a petition to the Secretary is a consumer's only means to seek remedies for defective equipment, nor does Defendant point to any such language elsewhere in the MVSA. The plain language of the MVSA indicates the opposite.

As discussed previously, the savings clause at 49 U.S.C. § 30103(d) specifically states that a remedy under § 30118 "is in addition to other rights and remedies under other laws of the United States or a State." Defendant argues that this savings clause cannot preserve the remedy of recalls because that remedy did not exist prior to the 1974 amendments to the MVSA. Contrary to Defendant's assertion, however, case law shows that, prior to enactment of the 1974 recall amendments to the MVSA, courts enforced State-law-based injunctive remedies similar to recalls in the field of vehicle safety. *Noel,* 342 F.2d at 237, 242; *Braniff,* 411 F.2d at 453. As discussed above, the plain meaning of the language in the savings clause at 49 U.S.C. § 30103(d) is that such State law remedies are preserved.

The cases Defendant cites in support of its conflict preemption arguments do not withstand scrutiny.

*Bridgestone I* is distinguishable on its facts. *Bridgestone I* found conflict preemption on the basis of frustration of Congress' purpose under the MVSA of providing exclusive administration of recalls through the NHSTA. In *Bridgestone I,* the plaintiffs purported to represent "[a]ll persons and entities in the United States who own or lease or owned or leased vehicles that are or were equipped with" certain Firestone tires. *Bridgestone I,* 153 F.Supp.2d at 938. Thus, any injunctive

remedy the *Bridgestone I* court might have provided would have affected a nationwide group of vehicle owners. As discussed above, Plaintiffs in the instant case represent only California owners of the subject vehicles. If this Court granted some form of injunctive relief to Plaintiffs, that relief would be limited in scope to California vehicle owners. Further, the *Bridgestone I* plaintiffs asked the court to make an initial declaration that the tires in question were "unreasonably dangerous and defective." The *Bridgestone I* court based its decision in part on what it stated was Congress' intent to grant exclusive discretion to the NHSTA to determine when a defect is dangerous enough to warrant notification or a remedy. *Bridgestone I,* 153 F.Supp.2d at 945.

Plaintiffs in the instant case do not request the Court to make such a declaration regarding the manifolds in question. Presumably, this is in part because Defendant allegedly has already conceded the danger of the manifold defect and instituted a partial recall. In *Bridgestone I,* there was no recall underway; the plaintiffs asked the court to initiate one. *Id.* Here, the gravamen of Plaintiffs' complaint is that the recall Defendant has already initiated simply is not broad enough because it does not include individual consumers. Should Plaintiffs' allegations be borne out, Defendant's failure to include individual consumers in its recall may be enjoined as unfair and fraudulent concealment and an exclusionary practice. Such an order would not constitute a court-initiated recall.

In addition to being distinguishable on its facts, *Bridgestone I* is based upon reasoning this Court finds unpersuasive. The court in *Bridgestone I* defined the field in question narrowly as recalls and found that the presumption against preemption did not apply because "States have never assumed a significant role in *recalls* related to vehicle safety." *Id.* at 942. On this basis, the *Bridgestone I* court analogized to *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 331–32, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), and *Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 500, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), cases which held laws conflict-preempted because "the administrative systems in place for managing the matters at issue ... were sufficiently comprehensive that any state law purporting to act in the area was a serious interference with the achievement of the full purposes and objectives of Congress." *Bridgestone I,* 153 F.Supp.2d. at 944. The *Bridgestone I* court applied too broadly the conflict preemption analysis in these cases.

Although *Int'l Paper* and *Chicago & N.W. Transp. Co.* concluded that a comprehensive administrative scheme and the granting of significant authority to a federal agency were sufficient evidence of congressional intent upon which to base a holding of conflict preemption, neither case addressed a situation in which the presumption against preemption applied. The Supreme Court in those cases, thus, did not require "clear evidence of conflict" in order to hold the State laws in question preempted. Both *Int'l Paper* and *Chicago & N.W. Transp. Co.* dealt with substantive areas of law historically subject to federal control and this fact was key to the Court's finding of preemption in both instances.

*Int'l Paper* dealt with a Vermont common law nuisance claim brought against a polluting paper company in New York. 479 U.S. at 481, 107 S.Ct. 805. The Court held the claim preempted due to its conflict with the Clean Water Act (CWA). *Int'l Paper,* 479 U.S. at 500, 107 S.Ct. 805. That interstate pollution is inherently a realm in which federal authority controls was crucial to the *Int'l Paper* Court's preemption holding. As the Court stated, "[i]n light of this pervasive regulation and

the fact that the control of interstate pollution is primarily a matter of federal law, [ ] it is clear that the only state suits that remain available are those specifically preserved by the Act." *Int'l Paper,* 479 U.S. at 492, 107 S.Ct. 805 (citation omitted). The Court did not look at the comprehensiveness of the regulatory scheme in isolation, but rather evaluated its significance in light of traditional federal control over the substantive area of law in question.

*Chicago & N.W. Transp. Co.* dealt with interstate commerce, also an area of traditional federal authority, and addressed conflict preemption of a shipper's State law claim against a railroad for inadequate service. 450 U.S. at 313–14, 101 S.Ct. 1124. In that case, the Interstate Commerce Commission (ICC) had approved the defendant railroad's application for abandonment of the rail line in question. *Id.* In holding the State law claim conflict-preempted, the Court stated that

> There can be no divided authority over interstate commerce, and ... the acts of Congress on that subject are supreme and exclusive.... Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity.

*Id.* at 318–19, 101 S.Ct. 1124 (internal quotations and citations omitted). *Chicago & N.W. Transp. Co.* is thus inapposite to this case, in which an area of historical State primacy is at issue and no agency action has been alleged.

*Int'l Paper,* and *Chicago & N.W. Transp. Co.* demonstrate that whether the area in question is traditionally an area of State or federal regulation affects the weight to be given to factors such as comprehensiveness or delegation of authority in determining whether a State law is conflict-preempted because it interferes with a congressional goal. In *Int'l Paper,* where no presumption against preemption applied, comprehensiveness of the regulatory scheme weighed heavily. This Court disagrees with the *Bridgestone I* court's assignment of such weight to the comprehensiveness of the MVSA. Because motor vehicle safety is an area of traditional State regulation, the comprehensiveness of a federal regulatory scheme in this area does not weigh as heavily as it did in *Int'l Paper* and *Chicago & N.W. Transp. Co.*

*Locke,* as discussed above, is a conflict preemption case and therefore inapposite Defendant's field preemption argument. It is equally inapposite to Defendant's conflict preemption argument, however, because, like *Int'l Paper* and *Chicago & N.W. Transp. Co.,* it dealt with an area of traditional federal primacy so the presumption against preemption did not apply. As the Court stated in *Locke,* in the field of maritime commerce, "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers" because the federal law in question regulates an area which "Congress has legislated ... from the earliest days of the Republic." *Locke,* 529 U.S. at 108–09, 120 S.Ct. 1135.

*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) is inapposite for much the same reason. *Crosby* dealt with conflict between State and federal laws providing sanctions against Burma. 530 U.S. 363, 370–71, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Foreign relations is an area traditionally regulated by the federal government, not the States. *United States v. Belmont,* 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). In *Crosby,* therefore, the Court did not find it necessary to address the issue of the presumption against preemption. *Crosby,* 530 U.S. at 374 n. 8, 120 S.Ct. 2288.

The remaining two recall cases that Defendant cites in support of its conflict preemption argument are no more persuasive.

*Lilly v. Ford Motor Co.,* 2002 WL 84603 (N.D.Ill. Jan.22, 2002), followed *Bridgestone I* and is distinguishable on its facts and unpersuasive in its reasoning for the same reasons as that case. *Namovicz v. Cooper Tire & Rubber Co.,* 2001 WL 327886 (D.Md.2001), is inapposite because it held claims for injunctive relief field-preempted, not conflict-preempted.

The remainder of Defendant's authority does not deal with recalls and is also distinguishable. *Nathan Kimmel, Inc. v. DowElanco,* 275 F.3d 1199 (9th Cir.2002) and *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) deal with fraud on regulatory agencies. In both cases, "the existence of ... federal enactments [was] a critical element" of the plaintiffs' claims and therefore such claims should be dealt with under the relevant federal regulatory scheme. *Nathan Kimmel,* 275 F.3d at 1206 (quoting *Buckman,* 531 U.S. at 353, 121 S.Ct. 1012). This analysis is inapposite to the instant case because Plaintiffs neither base their claims on the MVSA nor allege "fraud-on-the-agency" by Defendant.

*Heckler v. Chaney* does not deal with conflict preemption at all, but rather stands for the proposition that an agency's decision not to enforce a regulation is not subject to judicial review. 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Plaintiff has not alleged that the NHTSA has considered any alleged violation of any federal regulation and decided not to pursue enforcement. Defendant makes an assertion to this effect in its reply, but provides no supporting information. At this stage of the proceeding, Defendant's unsupported allegation of an NHTSA decision is not a sufficient basis upon which to invoke the bar to judicial review discussed in *Heckler* as a basis for dismissal.

Defendant thus does not carry its burden to overcome the presumption against preemption with regard to its conflict preemption arguments because it fails to demonstrate a sufficiently specific "actual conflict" with MVSA provisions, subsidiary regulations, or with congressional objectives for the MVSA. Neither Defendant's argument for preemption based on frustration of the congressional objective of uniformity nor its assertion of conflict due to interference with the comprehensive scheme of the MVSA and its delegation of administrative authority demonstrates the "clear and manifest" intent of Congress as required where, as here, the presumption against preemption applies. *ARC Am. Corp.,* 490 U.S. at 101, 109 S.Ct. 1661. Nor do these claims meet the less stringent requirement of showing "clear evidence of conflict" required under *Geier* to find preemption. The Court therefore denies Defendant's motion for dismissal of Plaintiffs' UCL claim on the ground of conflict preemption.

CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' UCL claim is DENIED.

IT IS SO ORDERED.