Patricia LASSEN, et al., Plaintiffs,

v.

NISSAN NORTH AMERICA, INC., Defendant.

Jason Shapiro, et al., Plaintiffs,

v.

Ford Motor Company, Defendant.

Richard Draeger, et al., Plaintiffs,

v.

Toyota Motor Sales, U.S.A., Defendant.

Bernice Wimley, et al., Plaintiffs,

v.

FCA US LLC, Defendant.

Daniel Chesler, et al., Plaintiffs,

v.

Hyundai Motors America, Inc., Defendant.

Case No. CV 15-06491-AB (MRWx), Case No. CV 15-09200-AB (MRWx), Case No. CV 15-09204-AB (MRWx), Case No. ED CV 15-02434-AB (MRWx), Case No. SA CV 15-01988-AB (MRWx)

United States District Court, C.D. California.

Signed September 30, 2016

Brian R. Morrison, Daniel R. Leathers, Martis Ann Alex, Labaton Sucharow LLP, New York, NY, Elaine T. Byszewski, Lee M. Gordon, Hagens Berman Sobol Shapiro LLP, Pasadena, CA, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, for Plaintiffs.

Carlos Manuel Lazatin, Michael W. Reynolds, O'Melveny and Myers LLP, Los Angeles, CA, Randall W. Edwards, O'Melveny & Myers, San Francisco, CA, Jill C. Griset, McGuireWoods LLP, Charlotte, NC, for Defendant.

### ORDER **GRANTING** MOTION TO DISMISS COMPLAINT [121] [26] [29] [28] [31] [33]

HONORABLE ANDRÉ BIROTTE JR., UNITED STATES DISTRICT COURT JUDGE

This Order resolves motions to dismiss in five related consumer fraud class action lawsuits against six Automakers concerning vehicles equipped with keyless fob ignition systems that lack an auto-off feature. The Plaintiffs assert that their vehicles' lack of an auto-off feature constitutes a design defect that the Automakers had a duty to disclose before sale. The Plaintiffs claim that by not disclosing before sale that the vehicles lacked auto-off, the Automakers engaged in fraud. The Automakers move to dismiss on numerous grounds.[1] The Court heard oral argument on June 27, 2016. For the following reasons, the motions to dismiss are **GRANTED**.

## I. PROCEDURAL BACKGROUND

All of the Plaintiffs originally filed their claims in August 2015 in a single Complaint against eighteen Automakers and their design entities. *See Patricia Lassen, et al v. Nissan North America, Inc., et al.,* No. 2:15–cv–06491–AB–MRW (C.D. Cal. filed August 26, 2015) (original action). That Complaint was filed by twenty-seven Plaintiffs, and asserted thirty-one causes of action under the law of nine states. In November 2015, the Automakers moved to dismiss on the ground of misjoinder and on substantive grounds also raised in the instant motions.

In response, the Plaintiffs voluntarily dismissed each defendant Automaker except Nissan, which remained in the original case. The Plaintiffs then filed eight separate class actions against most of the dismissed Automakers, for a total of nine cases. Plaintiffs voluntarily dismissed four of the cases, so these five remain.

Hereinafter, as necessary, the Court will refer to the cases by their Automaker defendant, e.g., *Nissan*. Because all of the individual actions are related to the original *Nissan* case, they were all transferred to the same judge. Each case asserts claims for common law and statutory con-

---

**1.** The Motions to Dismiss are docketed as follows:

CV 15-06491-AB (MRWx), Dkt. No. 121
CV 15-09200-AB (MRWx), Dkt. No. 26
CV 15-09204-AB (MRWx), Dkt. No. 29
ED CV 15-02434-AB (MRWx), Dkt. No. 28
SA CV 15-01988-AB (MRWx), Dkt. Nos. 31, 33.

sumer fraud and unjust enrichment under California law. In addition, all cases except *Ford,* which involves only California claims, also assert some combination of analogous common law and statutory consumer fraud claims, and claims for breach of the implied warranty of merchantability and unjust enrichment, under Colorado, Florida, Massachusetts, New Jersey, and New York law.[2] The Court also notes that although the docket in each case except *Nissan* reflects that only one Complaint has been filed, those Complaints are actually their Plaintiffs' second efforts to assert their claims because Plaintiffs initially asserted all of their claims against all of the Automakers in the *Nissan* case.

The Complaints allege facts and assert theories that are the same in all respects material to the disposition of these motions, and the motions raise similar grounds for dismissal: preemption, primary jurisdiction, lack of standing, and failure to state a claim. The Court will only reach preemption, primary jurisdiction, and standing, and the analyses apply in the same way to all claims. Accordingly, for ease of review and to conserve the Court's and the parties' resources, the Court is issuing this single order resolving all six of the motions rather than a separate order for each case.

## II. THE COMPLAINTS

As noted, these five cases were initially filed as a single case, and although there are now five different operative Complaints their factual allegations are essentially the same. The Court will thus refer to all Plaintiffs collectively, and to all of the defendants collectively as the Automakers. For purposes of summarizing the relevant facts, the Court will refer to the

First Amended Complaint ("FAC," Dkt. No. 111) in *Nissan.*

Plaintiffs own or lease vehicles manufactured by the Automakers that are equipped with an electronic keyless fob system ("keyless fob") to start the ignition. FAC ¶¶ 1, 39. Keyless fobs allow the driver to start the ignition without using a conventional key. *Id.* at ¶ 2. Keyless fobs transmit an electronic signal to a computer system in the vehicle, and when the fob is inside the car, the driver starts the vehicle's engine by pressing a stop/start button on the dashboard. *Id.* at ¶ 9. Although the keyless fob must be inside the vehicle for the vehicle to be started, vehicle engines do not automatically turn off when the keyless fob is removed from the vehicle; to turn off the vehicle, the driver must press the start/stop button. *Id.* at ¶¶ 6, 11. Thus, if a driver parks, exits the vehicle, and removes the fob from the vehicle but does not press the start/stop button, the vehicle's engine will continue to run, presumably until its fuel supply is exhausted. *Id.* at ¶¶ 6, 11, 14.

Running engines emit carbon monoxide, and the build-up of carbon monoxide in enclosed spaces like garages poses a risk of serious injury from carbon monoxide poisoning. *Id.* at ¶¶ 12, 17. Plaintiffs allege that drivers "fail to appreciate that the Keyless Fob plays no role in turning off a Keyless-Fob-equipped vehicle's engine," *id.* at ¶ 14, so drivers sometimes inadvertently leave such vehicles running in enclosed spaces. *Id.* at ¶ 27. Plaintiffs thus claim that such vehicles "have a dangerous propensity to cause carbon monoxide poisoning." *Id.* at ¶ 86.

At various places, the FAC catalogs a number of incidents of carbon monoxide poisoning—including fourteen deaths—re-

---

**2.** Two cases, *FCA* and *Hyundai,* also included claims under Connecticut law, but those

claims were voluntarily dismissed.

sulting from keyless fob-equipped vehicles left running in enclosed spaces like garages. *See, e.g., id.* at ¶¶ 17-22, 164-166. Plaintiffs contend that vehicles equipped with keyless fobs should be equipped with an auto-off feature ("Auto-Off") by which the vehicles would automatically turn off after a certain amount of time, and that it is a design defect for such vehicles to not have Auto-Off. *See id.* at ¶ 15 ("The lack of an Auto-Off system in the Affected Vehicles (hereinafter, the 'Defect') is dangerous and defective for the reasons described herein.").

Six Plaintiffs remain in the *Nissan* action, and their allegations are all similar. Plaintiff Lassen's allegations are representative. She purchased her 2007 Nissan Murano in 2013 from a BMW dealer. *Id.* at ¶ 41. She reviewed the marketing materials on Nissan's website, and none of the pre-sale materials she reviewed disclosed that the vehicle lacked Auto-Off, and that the lack of Auto-Off poses a serious safety risk. *Id.* at ¶¶ 46-48. Lassen "inadvertently left the vehicle running on at least two occasions, once at home and once at work." *Id.* at ¶ 49. She claims that "[if] not for the fact that a neighbor told her that her car continued to run while she was [sic], she would not have noticed." *Id.* Plaintiff claims that she is now concerned about the lack of Auto-Off in the vehicle, that she "would not have leased[3] or would have paid less for the lease had she known of the Defect beforehand," and that she therefore overpaid for the vehicle. *Id.* at ¶¶ 50, 54, 55. All of the Plaintiffs in all of the cases make similar allegations: they reviewed pre-sale marketing materials before purchasing their vehicles, none of those materials disclosed the lack of Auto-Off and the resulting danger, they experienced the vehicle not automatically turning

off, they are now concerned about the lack of Auto-Off, and they would not have purchased or leased their vehicles or would have paid less had they known about the lack of Auto-Off, and they were harmed by overpaying.

No Plaintiff in these cases suffered any physical injury. Indeed, the classes expressly exclude "individuals who have suffered personal injuries as a result of the facts alleged herein." *Id.* at ¶¶ 221. Rather, Plaintiffs claim their harm consists of three elements: first, each "inadvertently left the [ ] Vehicles' engines running, and therefore have experienced the Defect first-hand"; second, they overpaid because the price of the defective keyless fobs was included in the vehicles' price; and third, the value of their vehicles is diminished. *Id.* at ¶ 39.

Notably, although all of the claims are premised on allegations that the lack of Auto-Off is a design defect, these are not products liability actions. Rather, Plaintiffs' claims sound in consumer fraud: they claim that the automakers unlawfully failed to disclose the alleged defect—that the vehicles lack Auto-Off—in order to induce them to purchase or lease the vehicles.

Plaintiffs seek declaratory and injunctive relief, including a determination that the affected vehicles are defective, an order requiring the Automakers to notify all class members that the affected vehicles are defective, an order requiring them to permanently repair the affected vehicles and to include Auto-Off in all newly-produced affected vehicles, an injunction barring them from "selling future vehicles with the Defect," and an injunction "requiring [them] to institute Auto-Off in all Affected Vehicles." *See Nissan* FAC Pray-

---

**3.** In a prior paragraph, the FAC states that Lassen purchased the vehicle. However, whether she purchased or leased the vehicle is not relevant to the disposition of the motion, so the FAC's inconsistency on this point is not material.

er for Relief, pp. 107-109. Plaintiffs also seek compensatory and punitive damages, disgorgement or restitution, and attorneys' fees and costs. *Id.*

## III. DISCUSSION

Each case asserts five California causes of action, and, as noted above, all of the actions other than *Ford* assert analogous claims under Colorado, Florida, Massachusetts, New Jersey, and/or New York law. The Court need only reach the Motions' preemption, primary jurisdiction, and standing arguments, all of which are based on federal law and apply in the same way to all of the claims.[4] Accordingly, for context the Court will describe the California claims, but need not go into depth about the parallel non-California claims.

The five California claims are: (1) violation of California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750, *et seq.*); (2) violation of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*); (3) violation of Cal. Civil Code § 1710 Deceit and Common Law Fraud; (4) violation of California's False Advertising Law ("FAL") (Bus. & Prof. Code § 17500 *et seq.*); and (5) unjust enrichment.

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the

CLRA. *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal.App.4th 663, 680, 38 Cal. Rptr.3d 36 (2006) (so stating).

The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

Under Cal. Civil Code § 1709, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." And under Cal. Civil Code § 1710(3), "deceit" includes the "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

The FAL, as relevant here, makes it unlawful to make "any statement, concerning [one'a products or services] ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

Finally, Plaintiffs claim the Automakers were unjustly enriched by Plaintiffs' purchase or lease of the defective vehicles.

All of Plaintiffs' claims rest on the same set of premises: that vehicles equipped with keyless fob systems that lack Auto-Off are defective, that the Automakers had a duty to disclose this defect prior to sale, that the Automakers failed to disclose the defect in order to induce Plaintiffs to pur-

---

**4.** That these analyses apply in the same way to all claims is implicit in the parties' briefing: the Automakers' preemption, primary jurisdiction, and standing arguments do not distinguish among the different claims but treat them collectively, and Plaintiffs' oppositions do the same. To the extent the parties refer to state law aspects of the claims, they refer to the California claims as a proxy for all of the claims. The Court on its own can discern no

difference among the various claims that would be material to its disposition of the motions. Finally, at oral argument, the Court asked counsel to address whether Plaintiffs' standing for all of their claims turns on whether the complaints allege a cognizable defect, and counsel responded in the affirmative without distinguishing among the claims. *See* Transcript of 06/27/2016 Hearing ("Tr.," *Nissan* Dkt. No. 129), 43:21-44:8.

chase or lease the vehicles, and that Plaintiffs would either not have purchased or leased the vehicles at all or would not have paid as much for them.

The Automakers move to dismiss all of the claims on various grounds. They contend that the Complaints fail at the threshold because Plaintiffs claims—all of which arise under state law—are preempted by federal law; that Plaintiffs' claims are barred by the doctrine of primary jurisdiction; and that Plaintiffs lack standing. The Automakers also argue that the claims are otherwise ill-pled under Fed. R. Civ. Proc. 8 and 9(b), and that Plaintiffs claims for equitable relief are unavailable because they have a remedy at law. The Court will state the applicable legal standards at is addresses each argument, as necessary. The Court will first address Plaintiffs' threshold arguments.

### A. Plaintiffs' Claims Are Not Preempted by Federal Law.

■ The Automakers pose several preemption-based arguments, so a brief overview of preemption doctrines is in order. Under the Supremacy Clause, state law that conflicts with federal law is of no effect and is preempted by the federal law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citing Article VI of the U.S. Constitution). A federal law may expressly or impliedly preempt a state law. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Here, the Automakers argue only that Plaintiffs'

claims are impliedly preempted by the National Highway Transportation Safety Act ("Safety Act").[5]

■ There are two types of implied preemption: field preemption and conflict preemption. Field preemption arises if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Conflict preemption arises either "where it is impossible [ ] to comply with both state and federal requirements ... or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (citations omitted). These varieties of conflict preemption are generally referred to as impossibility and frustration-of-purpose, respectively. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 874, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

■ The Supreme Court has cautioned that "courts should not lightly infer preemption." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Instead, "and particularly in those [cases] in which Congress has 'legislated ... in a field which the States have traditionally occupied,' we start with the

---

**5.** The Safety Act includes an express preemption clause: "(b) Preemption. (1) When a motor vehicle safety standard is in effect under this chapter, a State ... may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter." 49 U.S.C.A. § 30103(b)(1). It also includes a savings clause indicating that state tort law and federal motor vehicle safety standards can coexist. *See* 49 U.S.C. § 3010(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."). However, no Automaker invokes express preemption—perhaps because there is no motor vehicle safety standard governing the issues raised herein—so the Court will not address it.

assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citing *Rice*, 331 U.S. at 230, 67 S.Ct. 1146). Thus, "[t]here is a presumption against implied preemption of State law in areas traditionally regulated by the states," *Chamberlan*, 314 F.Supp.2d at 958, but this presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).

### 1. Plaintiffs' Claims are Not Preempted in Their Entirety by the Safety Act.

█ Some Automakers contend that all of Plaintiffs' claims are preempted in their entirety by the Safety Act, but it is not clear whether they invoke field preemption or conflict preemption. If field preemption, there is no basis for finding that federal law has occupied the entire field of vehicle safety regulation such that field preemption applies. To the contrary, it is clear that "Congress in the Safety Act plainly did not intend to occupy the field of motor vehicle safety." *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000).

█ Nor does conflict preemption apply. For Plaintiffs' claims to be conflict-preempted, "[t]here must be 'clear evidence' of such a conflict." *Chamberlan v. Ford Motor Co.*, 314 F.Supp.2d 953, 957 (N.D. Cal. 2004) (quoting *Geier*, 529 U.S. at 885, 120 S.Ct. 1913). "Speculative or hypothetical conflict is not sufficient: only State law that 'actually conflicts' with fed-

eral law is preempted." *Id.* (quoting *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608). The Automakers point out that the National Highway Transport Safety Administration ("NHTSA"), pursuant to its authority under the Safety Act, is considering a proposed rule declining to mandate an auto-off feature and instead mandating an audible alarm should a driver remove the keyless fob from a running vehicle. *See* Not. Prop. Rulemaking, 76 Fed. Reg. 77184, 77184 (Dec. 12 2011). But, the proposed rule has not been adopted, so it presents no "actual conflict" with state law. The motions to dismiss Plaintiffs' actions in their entirety on preemption grounds are therefore **DENIED**.

### 2. The Recall Remedy Plaintiffs Seek Is Not Preempted by the Safety Act.

█ Some Automakers also argue for a more surgical application of conflict preemption: to Plaintiffs' prayer for injunctive relief in the form of a recall.[6] In their Complaints, Plaintiffs do not use the term "recall," but they seek orders requiring the Automakers to notify all class members that their vehicles lack Auto-Off and to permanently repair the vehicles. *See Nissan* FAC Prayer for Relief, pp. 107-109. For purposes of this motion, the Court deems such relief as equivalent to a recall.

Insofar as the Automakers premise their conflict preemption argument on the claim that "the NHTSA has exclusive authority to order a recall of motor vehicles under the Safety Act. 49 U.S.C. §§ 30118-30120," *see Ford's* Mot. 21:23-34, that premise is unfounded. None of the code sections cited indicates that the NHTSA's authority is exclusive; rather, these sections prescribe the steps the Secretary of Transporta-

---

**6.** It is not clear whether this is a Rule 12(f) motion to strike or a Rule 12(b)(6) motion. The Court will treat this as a motion to dismiss Plaintiff's claims insofar as they seek injunctive relief that is tantamount to a recall.

tion—who delegated his authority to the NHTSA—must undertake to effectuate a recall, but none of them says that *only* the Secretary may take such actions.

The true thrust of the Automakers' preemption argument appears to be that any recall remedy is preempted because a court-ordered recall would frustrate the objectives of the Safety Act by interfering with the regulatory framework the Act establishes for NHTSA investigations of motor vehicle defects and recalls. In recent years, several courts have addressed at length and rejected this frustration-of-purpose argument. *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig. (In re Unintended Acceleration)*, 754 F.Supp.2d 1145, 1195–96 (C.D. Cal. 2010), and *Kent v. DaimlerChrysler Corp.*, 200 F.Supp.2d 1208, 1212–13 (N.D. Cal. 2002). This Court is persuaded by the thoughtful analyses in *In re Unintended Acceleration* and *Kent*, and perceives no material difference between the arguments resolved in those cases and the arguments raised here. The Court also acknowledges that cases from other circuits have found the recall remedy preempted, *see, e.g., In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig. (In re Bridgestone)*, 153 F.Supp.2d 935, 944–948 (S.D. Ind. 2001), but *In re Unintended Acceleration* and *Kent* are more persuasive.

The starting point of the analysis is whether the presumption against preemption applies. In *In re Unintended Acceleration*, the court applied the presumption against preemption because motor vehicle safety is a field traditionally regulated by the states. *See In re Unintended Acceleration*, 754 F.Supp.2d at 1196–1197. In *In re Bridgestone*, by contrast, the court defined the relevant area of law as motor vehicle recalls, and found that the presumption against preemption did not apply because states have "never assumed a significant

role in *recalls* related to vehicle safety." *See In re Bridgestone*, 153 F.Supp.2d at 942 (emphasis in original). But as *In re Unintended Acceleration* observed, a recall is a remedy and not a substantive field of regulation, so a recall cannot be a relevant area of substantive law; rather, motor vehicle safety is the relevant area of substantive law. *In re Unintended Acceleration*, 754 F.Supp.2d at 1196. Because "[m]otor vehicle safety is an area of traditional State police power," *City of Columbus v. Ours Garage and Wrecker Serv.*, 536 U.S. 424, 439, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002), and "[i]n no field has . . . deference to state regulation been greater than that of highway safety regulation," *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), the presumption against preemption applies. It follows that "because a presumption against preemption applies [ ], [the Automakers bear] the burden of showing that it was Congress' 'clear and manifest' intent to preempt State law." *Chamberlan*, 314 F.Supp.2d at 962 (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)).

The Automakers have not demonstrated that Congress had a "clear and manifest" intent to preempt state law recall remedies. Their arguments turn on the assumption that a recall remedy is so different from other remedies (such as damages) that they should be treated differently. But it makes little sense to split remedies in an implied preemption analysis because the question is whether the *cause of action* is preempted, not whether a particular remedy is preempted. "[U]nless there is evidence that Congress meant to 'split' a particular remedy for pre-emption purposes, it is assumed that the full cause of action under state law is available [or preempted]." *Int'l Paper*, 479 U.S. at 499 n.19, 107 S.Ct. 805; *see also Kent*, 200 F.Supp.2d at 1217 ("ordinarily it is assumed that the

full cause of action under state law is either available or preempted"). The Safety Act does not reflect any Congressional intent to distinguish among different remedies; to the contrary, if "an injunction requiring a particular repair would 'interfere' with the federal regulatory scheme—so too would a damages award based on the failure to make such a repair." *Kent*, 200 F.Supp.2d at 1217. Thus, the there is no reason to treat a recall remedy different from a damages remedy.

Nor have the Automakers shown that a recall would frustrate Congress's purpose in passing the Safety Act. "The clearest possible expression of legislative purpose is provided in the first section of the Act itself: 'the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.' 15 U.S.C. § 1381." *Chrysler Corp. v. Tofany*, 419 F.2d 499, 508 (2d Cir. 1969). The Automakers have not shown how a court-ordered recall would frustrate the Safety Act's purpose of reducing traffic accidents and deaths and injuries from traffic accidents, or that the proposed recall would *actually* conflict with federal law, as, indeed, the NHTSA has issued no regulation germane to keyless fobs and Auto-Off.

The Automakers also argue that a court-ordered recall would frustrate another Congressional purpose in enacting the NHTSA: uniformity in regulation and administration of recalls. However, Congress itself indicated " 'that safety shall be the overriding consideration in the issuance of standards under this bill.' [S.Rep. No. 1301 at 2714]." *Tofany*, 419 F.2d at 508. Unsurprisingly, the weight of authority holds that motor vehicle safety was Congress's paramount concern when it passed the Safety Act, and uniformity was of less importance. *See, e.g., Chamberlan*, 314

F.Supp.2d at 963 ("the primary congressional objective behind the MVSA is safety. While legislative history demonstrates a federal interest in uniformity of motor vehicle safety regulation and administration of recalls, uniformity is at best a secondary goal"); *Buzzard v. Roadrunner Trucking*, 966 F.2d 777, 783 (3d Cir. 1992) ("uniformity was merely a secondary concern to Congress when it enacted the Safety Act. Accordingly, uniformity cannot take precedence over Congress's primary goal of safety, nor can it defeat Congress's intent, as set out in section 1397(k) of the Act to permit state common law to develop more stringent design requirements in the interest of increased safety."); *Tofany*, 419 F.2d at 508 ("Although Chrysler stresses that Congress decreed uniformity, the clear expression of purpose in section 1381 and the other evidence of legislative intent indicate that the reduction of traffic accidents was the overriding concern of Congress."). To the extent a court-ordered recall would risk undermining uniformity in regulation, that interest is outweighed by Congress's paramount interest in safety and its corresponding acceptance of continued state involvement in promoting vehicle safety.

The Court therefore finds that the Safety Act does not evince a "clear and manifest" Congressional intent to preempt recalls based on state law,[7] so the presumption against preemption applies and the recall remedy is not preempted by the Safety Act. The motions to dismiss or strike on this ground are therefore **DENIED.**

### B. Plaintiffs' Claims are Not Barred by Primary Jurisdiction.

▮▮▮ Some Automakers also contend that all of Plaintiffs' claims, and the recall remedy in particular, are barred by the

---

7. The Court's ruling that the recall remedy is not preempted does not, of course, mean that

it is otherwise an appropriate remedy in this case.

doctrine of primary jurisdiction. Under the doctrine of primary jurisdiction, a court may decline to adjudicate "a judicially cognizable claim where 'enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Marsikian v. Mercedes Benz USA, LLC*, 2009 WL 8379784, at *9 (C.D. Cal. May 4, 2009) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). But none of Plaintiffs' claims arise under the Safety Act or litigate any regulation or standard that the NHTSA has issued; rather, their claims arise under ordinary state law contract and tort principles. The Automakers have not shown that any special agency competence is required to adjudicate these claims, so the doctrine of primary jurisdiction does not apply. These motions are **DENIED.**

### C. Plaintiffs Have Not Alleged Article III Standing or a "Defect".

 The Automakers also move to dismiss the actions under Rule 12(b)(1) on the ground that Plaintiffs lack standing. A federal court may not adjudicate a case unless the plaintiff has suffered an injury that satisfies the "case or controversy" requirement of Article III of the United States Constitution. To establish Article III standing, a plaintiff must have suffered an "injury in fact" that is "distinct and palpable"; the injury must be fairly traceable to the defendant's conduct; and the injury must be redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130.

The Automakers challenge Plaintiffs' standing on several bases.[8]

### 1. Plaintiffs Have Not Alleged an Injury In Fact.

The Automakers argue that the Plaintiffs have not alleged injury in fact because they were not harmed by the alleged defect, and because they received what they paid for.

These actions expressly exclude persons who suffered physical injury as a result of inadvertently leaving their vehicles running, so standing must be premised on some other type of harm. Plaintiffs seem to argue that the following allegations combine to give them standing: they experienced the alleged defect because they experienced their cars not automatically turning off after they inadvertently left them on, *see Nissan* FAC at ¶ 39; they are "concerned about the lack of Auto-Off in the vehicle," *see id.* at ¶ 50; other people have suffered carbon monoxide poisoning, *see id.* at ¶¶ 17-22; and their injury in fact is that they would not have purchased or leased their vehicles, or would have paid less, had they known they lacked Auto-Off, and their vehicles diminished in value. *Id.* at ¶¶ 39.

### a. Plaintiffs' Concerns About the Alleged Defect, and Injuries to Others, Do Not Establish Injury In Fact.

 The first two allegations—that Plaintiffs experienced their cars not auto-

---

**8.** Most Automakers asked the Court to take judicial notice of the Owners' Manuals for Plaintiffs' vehicles, arguing that they make the very disclosures that Plaintiffs contend they omitted, thereby obviating standing and otherwise undermining Plaintiffs' claims. Plaintiffs respond that the Owners' Manuals are not judicially noticeable and are irrelevant to

their claims in any event because the disclosures should have been made before the sale and not afterwards through the Owners' Manuals. The Court need not reach these issues at this juncture because even without considering the Owners' Manuals, Plaintiffs lack standing.

matically turning off and are concerned about the lack of Auto-Off—do not establish standing because they do not constitute any kind of injury. Merely experiencing a vehicle not automatically turning off, and being concerned about the lack of Auto-Off, are not concrete harms. Both allegations suggest that Plaintiffs are "concerned" they may be harmed if they inadvertently leave their cars running again, but because Plaintiffs have expressly limited themselves to economic damages, they cannot base standing on their "concern" about future personal injury. *See Harrison v. Leviton Mfg. Co.*, 2006 WL 2990524, at *7 (N.D. Okla. October 19, 2006) (plaintiffs limiting their claims to economic damages cannot base standing on risk of injury). In addition, Plaintiffs' concerns about future harm amount to only a speculative risk of injury: the Complaints reveal that out of all the times the Plaintiffs have parked their vehicles, they left them running only a handful of times (usually once or twice), and never suffered physical injury.

 Nor do Plaintiffs' allegations that others suffered carbon monoxide poisoning establish standing: that other people were injured does not establish any particularized injury as to *these* Plaintiffs. *See Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918, at *4 (N.D. Cal. June 20, 2013) ("Plaintiffs fail to cite any authority for the proposition that the Court may appropriately consider the alleged personal experiences of a non-party" to determine adequacy of pleading). And, other peoples' physical injuries do not establish Plaintiffs' standing to pursue their claimed economic harms. Injuries suffered by others *can* help establish a non-injured plaintiffs' claim that the defect diminished the value of his vehicle because widespread reports of the defect could decrease market de-

mand for the vehicle. *See In re Unintended Acceleration*, 754 F.Supp.2d at 1162 (finding standing where plaintiffs pled widespread knowledge about defect, market value declined, and plaintiffs sold vehicles at a loss). But, the Complaints here lack any allegation that Plaintiffs' vehicles declined in value because they lack Auto-Off. In fact, Plaintiffs admit that the issues they raise with keyless fob design have not received attention from the national mainstream media. *See Ford* Mot. Dkt. No. 31, p. 18 fn. 15. It therefore follows that the diminution in resale value that such attention may cause has not occurred here.[9] And, the Court can discern no nexus between other peoples' physical injuries and Plaintiffs' claimed economic harm of having paid too much for their vehicles. In short, Plaintiffs' allegations that other people experienced carbon monoxide poisoning do not establish any injury in fact to support Plaintiffs' claims for economic loss.

**b. Plaintiffs' Claimed Economic Injuries Are Not Injuries In Fact Under the Facts Pled.**

 Plaintiffs argue that their economic injuries establish injury in fact for standing purposes. It is true that both overpayment and diminution in value are theoretically cognizable injuries-in-fact. *In re Unintended Acceleration*, 754 F.Supp.2d at 1162 ("In principle, the Court agrees … that 'overpayment, loss in value, or loss of usefulness' is sufficient to confer standing."). But, a plaintiff must still plead facts sufficient to establish these injuries-in-fact. Plaintiffs have not done so.

Although all of Plaintiffs' claims depend on the Automakers selling them a defective product, this is not a products liability action. Indeed, Plaintiffs cannot pursue

---

**9.** At oral argument, Plaintiffs' counsel clarified that Plaintiffs' standing is not based on the vehicles' diminution in value, but instead

is premised on overpayment for the vehicles. *See* Tr. 86:25-87:9.

products liability claims because they did not experience physical injury to person or property. *See San Francisco Unified School Dist. v. W.R. Grace & Co.*, 37 Cal. App.4th 1318, 1327, 44 Cal.Rptr.2d 305 (1995) ("Until physical injury occurs—until damage rises above the level of mere economic loss—a plaintiff cannot state a cause of action for strict liability or negligence."). Because products liability law does not authorize no-injury actions, Plaintiffs have attempted to ground their claims in consumer fraud and seek contract-oriented economic damages: that the Automakers wrongfully induced Plaintiffs to purchase their vehicles by concealing a material fact (the alleged defect), and that Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all had they known of the defect.

By this hybrid action, Plaintiffs seek to recover damages for an alleged defect that did not injure them and that would not therefore give rise to a products liability claim. *See Kanter v. Warner–Lambert Co.*, 99 Cal.App.4th 780, 790, 122 Cal.Rptr.2d 72 (2002) ("[u]nder the product liability law of California, injury to the plaintiff from a defective product is an essential element of a cause of action," and that "if the damage consists solely of economic losses, recovery on a products liability theory is unavailable."); Restatement (Third) of Torts: Prod. Liab. § 21 (1998) ("Some categories of loss, including those often referred to as 'pure economic loss,' are more appropriately assigned to contract law and the remedies set forth in Articles 2 and 2A of the Uniform Commercial Code" than to products liability law).

A number of courts have rejected for lack of standing or injury similar attempts to recast no-injury products-liability claims (which are not cognizable) as consumer fraud claims for contract-like economic damages (which *may* be cognizable). *See, e.g, Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (claimed economic injury arising out of properly-functioning iPod that posed only risk of harm was not injury in fact because theory of defect was not cognizable and plaintiff otherwise received benefit of bargain); *Whitson v. Bumbo*, 2009 WL 1515597, at *6 (N.D. Cal. Apr. 16, 2009) (no standing where "the instant complaint oscillates between tort and contract law language but fails to allege any actual injury"); *Briehl v. General Motors Corp.*, 172 F.3d 623, 627–628 (8th Cir. 1999) (affirming dismissal of consumer fraud and related claims because plaintiff received benefit of bargain where anti-lock brakes performed effectively but in a counter-intuitive way that could lead to injury, and plaintiff pled only overpayment at purchase and lost resale value); *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 320–21 (5th Cir. 2002) ("the general [contract] principles [plaintiffs] invoke do not help them. [Plaintiff] paid for an effective pain killer, and she received just that—the benefit of her bargain... The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege— failure to warn and sale of a defective product—are products liability claims. [ ] Yet, the damages they assert—benefit of the bargain, out of pocket expenditures— are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact."); *In re Bridgestone*, 288 F.3d 1012, 1017 (7th Cir.2002) (expressing skepticism that no-injury product liability claims can be cognizable as contract/fraud claims, stating "[n]o injury, no tort, is an ingredient of every state's law. [ ] Plaintiffs describe the injury as financial rather than physical and seek to move the suit out of the tort domain and

into that of contract (the vehicle was not the flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling products with undisclosed attributes, and thus worth less than represented, is fraudulent). It is not clear that this maneuver actually moves the locus from tort to contract."). Plaintiffs' attempt to hybridize legal doctrines here similarly fails because ultimately, under the facts pled, Plaintiffs have not suffered any injury in fact.

Plaintiffs argue that they suffered an injury in fact because they overpaid for their vehicles. *Birdsong* is instructive as to why overpayment does not establish in this case. There, the plaintiffs alleged that their iPods were defective because they could be played at volumes that could cause hearing loss, yet "lacked 'noise isolating or cancelling properties,' and [ ] lack[ ] any volume meter that will inform users they are listening at dangerous levels." *Birdsong*, 590 F.3d at 958. The plaintiffs did not claim any actual physical injury to themselves but alleged that the claimed defect made their iPods worth less than what they paid for them. *Id.* at 961. As here, the *Birdsong* plaintiffs couched their claims for economic loss in terms of fraud, breach of warranty, the UCL, and similar theories. Despite plaintiffs' invoking such theories, the Ninth Circuit recognized that the plaintiffs' claimed economic injuries derived from a fear of future physical harm. The court therefore analyzed standing by considering whether the feared physical harm was concrete and particularized, and actual and imminent, and relatedly, whether the purported defect underlying the alleged economic loss was actually cognizable as a defect. The court found that "the alleged loss in value does not constitute a distinct and palpable injury that is actual or imminent because it rests on a hypothetical risk of hearing loss to other consumers who may or may not choose to use their iPods in a risky manner." *Id.* at 961. The court also found that the plaintiffs pled only "conjectural and hypothetical [ ] injury as the plaintiffs merely assert that some iPods have the 'capability' of producing unsafe levels of sound and that consumers 'may' listen to their iPods at unsafe levels combined with an 'ability' to listen for long periods of time." *Id.* Furthermore, as to the claimed defect, the plaintiffs failed to plead that the iPods malfunctioned or "failed to do anything they were designed to do," and instead they "merely suggest[ed] possible changes to the iPod which they believe[d] would make the product safer." *Id.* at 959. Thus, although plaintiffs' alleged economic harm "centers on their claim that the iPod has a defect (an inherent risk of hearing loss)," they "failed to allege any cognizable defect." *Id.* at 961–962. Absent a cognizable defect, plaintiffs failed to plead any injury in fact. The court concluded that the plaintiffs showed none of the three components of standing.[10]

*Taragan v. Nissan* is also instructive. Like this case, *Taragan* involved vehicles equipped with a keyless fob system. The plaintiffs claimed the system was defective because it allowed the vehicle to be stopped and the engine turned off without requiring the driver to first put the transmission in park. As a result, such vehicles posed a greater risk of rollaway incidents than vehicles with conventional keys do. *Taragan*, 2013 WL 3157918 at *3. Although the complaint did not allege that any of the plaintiffs experienced a rollaway incident, the plaintiff asserted they could amend the complaint to allege that one

---

10. More precisely, the court discussed standing under the UCL standard, but also noted that standing under the UCL is consistent with standing under Article III, such that the plaintiffs would lack Article III standing for the same reasons. *See Id.* at 960, and fn. 4.

plaintiff and at least one non-party did. *Id.* at *4. The court dismissed all of plaintiffs' consumer fraud and related claims on several grounds. As relevant here, the " 'risk' that vehicles equipped with the [keyless fob] system will roll away if the operator fails to place the transmission in park after shutting off the engine" did not support a claim because this "claim of defect [was] theoretical" and the plaintiffs did not actually experience a rollaway incident. *Id.* at *5. The court also noted that "the alleged rollaway risk is particularly attenuated given that it only manifests, if at all, if the vehicle operator fails to exercise common sense and prudence by placing the transmission in park and applying the parking brake when leaving the vehicle." *Id.* at fn. 5.

Plaintiffs here assert similar claims as those in *Birdsong* and *Taragan*: that their vehicles' keyless fob systems are defective because Plaintiffs can use them in a dangerous way, and they lack a safety feature—Auto-Off—that could mitigate that danger. However, as in *Birdsong* and *Taragan*, Plaintiffs have pled only a conjectural and hypothetical injury: their vehicles have the *capability* of causing carbon monoxide poisoning, but this risk depends entirely on Plaintiffs' parking their vehicles in an enclosed space and walking away from their vehicles without turning them off. Any actual injury—carbon monoxide poisoning—that could result is purely theoretical because no Plaintiff actually experienced that injury. Any injury is also attenuated because that risk of harm manifests not because the vehicles malfunction or fail, but rather because of human error: drivers neglect to press the start/stop button to stop the vehicle's engine.

Most problematic, as discussed more fully below, Plaintiffs have not pled a design defect that is actionable in the consumer fraud context, and as counsel admitted, absent a defect, Plaintiffs lack standing. *See* Tr. 43:21–44:8 (Plaintiffs' counsel acknowledging that standing for all of their claims turns on whether the Complaints allege a cognizable defect). Plaintiffs do not allege that the keyless fob systems malfunctioned or "failed to do anything they were designed to do," and instead they "merely suggest[ed] possible changes... which they believe[d] would make the product safer." *Birdsong*, 590 F.3d at 959. Insofar as Plaintiffs' claimed economic damages arising out of the alleged "defect" can be characterized as "benefit of the bargain" damages, they fail to establish standing because that "alleged injury in fact is premised on the loss of a 'safety' benefit that was not part of the bargain to begin with." *Id.* at 961–62. Plaintiffs cite no cases in which a product that worked as intended could support consumer fraud claims for failure to disclose a defect. Rather, each consumer fraud case that Plaintiffs rely on involved a product malfunction or failure. *See, e.g., In re Unintended Acceleration*, 754 F.Supp.2d at 1159 (electronic and/or mechanical issues cause vehicles to have sudden unintended acceleration); *Kearney v. Hyundai Motor Am.*, 2010 WL 8251077, at *2 (C.D. Cal. Dec. 17, 2010) (airbags fail to deploy when persons of small-stature adult size are seated in vehicle despite manufacturer's claim that its system automatically adjusts the power at which its front seat airbags will deploy based upon occupant weight and height); *Grodzitsky v. Am. Honda Motor Co.*, 2013 WL 2631326, at *1 (C.D. Cal. June 12, 2013) (window regulator fails, causing window to fall into open position and rendering it inoperative, and window may shatter); *Philips v. Ford Motor Co.*, No. 14–CV–02989–LHK, 2015 WL 4111448, at *1 (N.D. Cal. July 7, 2015) (power steering system fails and defaults to manual steering, leading to increased risk that driver will lose control of vehicle);

*Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F.Supp.3d 1306, 1312 (C.D. Cal. 2013) (engines do not "utilize engine oil properly, and [] improperly burn[] off and consume[] 'abnormally high amounts of oil'" which can cause engine failure while the vehicle is in operation); *In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936, 949 (N.D. Cal. 2014) (vehicle "infotainment system" manifests numerous malfunctions, including "the entire system freezing up or crashing", blackouts, nonresponsiveness, the rearview camera locks up, inaccurate directions on the navigation system); *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *3 (C.D. Cal. Nov. 8, 2013) (design defect allows moisture to enter dishwasher control panels, causing it to fail and to short-circuit, resulting in a fire hazard); *Marsikian*, 2009 WL 8379784, at *1 (vehicle's air intake system susceptible to clogging and accumulation of water, resulting in damage to computer and electrical systems, and possible catastrophic engine failure); *Elias v. Hewlett–Packard Co.*, 2014 WL 493034, at *1 (N.D. Cal. Feb. 5, 2014) (computer lacks power sufficient to handle the graphics card that defendant sold with it, causing computer to freeze, restart, or shut down, and ultimately "short out" and melt); *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1092 (N.D. Cal. 2007) (speedometers malfunction by "sticking, moving in jerky increments and reading incorrect speeds"); *Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *1 (C.D. Cal. July 18, 2013) ("design defect in the Electric Power Steering [] causing the vehicles to drift from the center at highway speeds or suddenly veer to one direction").

In summary, Plaintiffs did not purchase their vehicles based on any expectation that they included additional safety features. From a consumer fraud perspective, Plaintiffs were entitled to expect that the suite of features included with their vehicles would function as designed; the Complaints reveal that that is what Plaintiffs received, and that Plaintiffs know how to use the keyless fob systems but inadvertently used them incorrectly on occasion. Plaintiffs make no allegation that the keyless fob systems malfunction or fail. Thus, Plaintiffs' allegations that they overpaid are untenable and cannot establish standing to pursue their consumer fraud claims.

The Court therefore concludes that Plaintiffs' concerns about the alleged defect, other peoples' physical injuries, and Plaintiffs' alleged overpayment do not establish standing, either singly or together, to pursue their consumer fraud claims.

### D. Plaintiffs Have Not Alleged a Design Defect that Could Support Their Consumer Fraud Claims.

As noted above, Plaintiffs' standing and all of their claims rest on the premise that vehicles equipped with keyless fob systems that lack Auto-Off are defective. The Automakers' duty to disclose the lack of Auto-Off prior to sale, and Plaintiffs' claimed economic harms, all flow from that premise. None of the states whose law is implicated in these actions appear to impose a general duty to disclose, but rather limit that duty to certain circumstances. In California, for example, courts have "generally rejected a broad obligation to disclose." *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012). However, a party has a duty to disclose "in four circumstances: '(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact.'" *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1094 (N.D. Cal. 2007) (identifying the

"*Judkins* factors," citing *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337, 60 Cal. Rptr.2d 539 (1997). Plaintiffs here invoke the latter three circumstances, all of which involve the duty to disclose a *material fact.*[11] Where a plaintiff's claim is that the material fact that the seller had a duty disclose is a defect, materiality requires that the defect pose a safety concern. *See Wilson*, 668 F.3d at 1141–1142 (discussing California and federal case law so holding).

▮ As suggested in the discussion above about standing, however, it is not clear that the lack of Auto-Off constitutes a design defect in the consumer fraud context. The Plaintiffs' memoranda failed to articulate a plausible legal theory of defect: Plaintiffs' vehicles did not malfunction or fail, if the vehicles remain running it is due to Plaintiffs' own inadvertence, and Plaintiffs did not discuss any theories, such as those from the products liability context, whereby a properly-functioning product could nevertheless be deemed defectively designed. At oral argument, the Court asked Plaintiffs' counsel to address this point. In particular, the Court asked counsel to explain how the keyless fob system—which worked as intended—was defective because it lacked Auto-Off. The Court also expressed skepticism that the design defect jurisprudence developed in the products liability context is transferable to the doctrinally distinct consumer fraud claims in this case, and asked counsel to respond.

▮ Plaintiffs' counsel argued that the legal standard for determining a design defect in the products liability realm applied. This standard in California, for example, allows a plaintiff to prove that a product's design is defective under either the "consumer expectations test" or the

"risk-benefit test." *See Lucas v. City of Visalia*, 726 F.Supp.2d 1149, 1154 (E.D. Cal. 2010) (identifying tests). Under the consumer expectations test, a "product's design is defective if it has failed to perform as safely as its ordinary consumers would expect when used in an intended or reasonably foreseeable manner," and under the risk benefit test "a product's design is defective if the design embodies 'excessive preventable danger,' that is, the risk of danger inherent in the design outweighs the benefits of such design." *See id.* (citing *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 430, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)). Also, a design must account for misuse: a "manufacturer [must] foresee some degree of misuse and abuse of his product, either by the user or by third parties, and [ ] take reasonable precautions to minimize the harm that may result from misuse and abuse." *Wright v. Stang Manufacturing Co.*, 54 Cal.App.4th 1218, 1235, 63 Cal.Rptr.2d 422 (1997).

The Restatement is similarly open-ended, defining a product as "defective in design" when "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor ... and the omission of the alternative design renders the product not reasonably safe." Restatement (Third) Torts: Prod. Liab. § 2.

Plaintiffs argued that keyless fob systems that lack Auto-Off pose an excessive increased risk of carbon monoxide poisoning because such systems increase the risk that drivers will inadvertently fail to shut off their vehicles, and that therefore such keyless fob system are defectively designed under products liability standards.

---

11. Plaintiffs treat the California approach to the duty to disclose as representative of the duty other states impose and do not argue that any other states demand more than Cali-

fornia does. The Court therefore assumes that if there is no duty under California law, there is no duty under other state laws implicated in these cases.

Indeed, it became apparent at oral argument that Plaintiffs so extensively pled other peoples' injuries in order to establish that the keyless fob systems are defectively designed. Such allegations may help plead a design defect for purposes of products liability law—indeed, the Court assumes that they do—but these are not products liability cases. Plaintiffs failed to acknowledge the novelty of their theory— that it is appropriate to rely on products liability standards for a design defect to prove that a properly-functioning product is defective for purposes of establishing a duty to disclose under consumer fraud law—and accordingly failed to justify it. They argued *for* their theory at length during oral argument, but did not explain *why* their theory was legally sound. There are several reasons why products liability design defect standards are not readily transferable to consumer fraud claims, especially where the product in issue did not fail or malfunction, but instead functioned as intended.

### 1. Products Liability Law and Consumer Fraud Law Serve Different Purposes.

Why products liability design defect standards do not readily transfer to the consumer fraud context can be understood by considering the purpose of each body of law.

The purpose of products liability law is to encourage manufacturers to optimize the safety of their products. *See* Restatement (Third) of Torts: Prod. Liab. § 2 cmt. (a) (for design and failure to warn defects, "[t]he emphasis is on creating incentives for manufacturers to achieve optimal levels of safety in designing and marketing products. Society does not benefit from products that are excessively safe . . . any more than it benefits from products that are too risky."). This is achieved by providing consumers a remedy for harm to persons or property caused by unreasonably danger-

ous products, thereby shifting the risks caused by such dangerous products from consumers to manufacturers. *Greenman v. Yuba Power Prod., Inc.*, 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) (the purpose of "imposing strict [products] liability on the manufacturer . . . is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves"). Thus, as noted below, products liability law will impose liability even where the defendant did not know the product was defective. However, such liability is limited to personal injury and property damage, *see* Restatement (Third) of Torts: Prod. Liab. § 1 cmt. d, § 21, and excludes mere economic loss, otherwise sellers could be exposed to open-ended tort liability for defects that have nothing to do with safety, a result that would be inconsistent with the safety-optimizing purpose of products liability law. In light of the purpose of products liability law—incentivizing manufacturers to optimize safety—it makes sense to impose liability when a properly-functioning product is nevertheless defectively designed under open-ended test like the "consumer expectations" or the "risk-benefit" tests, but only for actual harm to persons or property, not for mere economic loss.

By contrast, the purpose of consumer fraud law is to prevent sellers from deceiving consumers about their products and services. *See* Cal. Civ. Code § 1760 (purpose of CLRA is "to protect consumers against unfair and deceptive business practices"). Insofar as consumer fraud law requires sellers to disclose defects that raise safety concerns, that is because safety-related defects are considered sufficiently *material* to trigger a duty to disclose in order to avoid deceiving a consumer, not because consumer fraud law is directly

concerned with consumer safety. *See Wilson*, 668 F.3d at 1141–1142 (where plaintiff claims that a seller failed to disclose a material fact that it had the duty to disclose, a defect is not material unless it poses a safety concern). Consumer safety is therefore incidental to consumer fraud law's paramount concern of preventing deception. Thus, where the basis of an alleged consumer fraud claim is that the seller failed to disclose a safety defect, and where gravamen of the defect is that the product does not malfunction but lacks certain additional safety features, the claim starts to become less about deception and more about consumer safety, which is not the immediate concern of consumer fraud law.

## 2. Products Liability Law Imposes Liability Regardless of a Defendants' Knowledge; Consumer Fraud Requires Knowledge.

Consistent with their different purposes, products liability law and consumer fraud law have different requirements for the seller's knowledge of the alleged defect. This gives the Court great pause about relying on products liability design defect standards to establish a design defect for purposes of consumer fraud claims.

Products liability law will hold all participants in the distribution chain liable for a defect regardless of whether they knew of the defect. *See* Restatement (Third) of Torts: Prod. Liab. § 1 cmt. (a) ("is no defense that they acted reasonably and did not discover a defect in the product"). Accordingly, whether a product that functions as intended is nevertheless defective under products liability law need not be self-evident but instead is decided retrospectively by a factfinder applying the open-ended, indeterminate, and unpredictable tests mentioned above. The risk/benefit test, for example, "directs the jury to weigh or balance a number of factors and sets out a list of competing considerations for the jury to evaluate in determining the existence of a design defect." *Anderson v. Owens–Corning Fiberglas Corp.*, 53 Cal.3d 987, 1001, 281 Cal.Rptr. 528, 810 P.2d 549 (1991); *see also* Restatement (Third) of Torts: Prod. Liab. § 2 cmt.(b)(c) ("Consumer expectations as to proper product design or warning are typically more difficult to discern than in the case of a manufacturing defect."). Because products liability law imposes liability regardless of a seller's knowledge of a defect, it is not problematic that its design defect tests establish the "defectiveness" of a properly-working product only in retrospect and only after applying open-ended legal standards.

By contrast, products liability law's retrospective, open-ended tests for "design defect" do not map to consumer fraud claims, where a defendant's prior knowledge of the defect is an element. To establish their consumer fraud claims, Plaintiffs must show that the manufacturers *knew* their vehicles were defective before selling them, and concealed or violated a duty to disclose the defect in order to induce Plaintiffs to purchase those vehicles. *Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765, at *4 (N.D. Cal. July 7, 2009), as amended (July 30, 2009) (citing California cases for proposition that "[a]ccording to all relevant case law, defendants are only under a duty to disclose a *known defect* in a consumer product when there are safety concerns associated with the product's use") (emphasis added). Thus, knowledge of the defect and its concealment or nondisclosure are elements of Plaintiffs' causes of action and are the foundation of their theories. Where a product's design causes the product to malfunction or fail, the alleged defectiveness of the design is evident, so a seller who knows a product malfunctions or fails can plausibly be charged with prior knowledge of a de-

sign defect. However, where, as here, the product functions as designed so its alleged "defectiveness" can only be established by the retrospective standards of products liability law, that "defectiveness" cannot also establish a defect for purposes of consumer fraud law, which requires that the seller had prior knowledge of that defect.

In summary, the retrospective design defect standards developed in the products liability context, in which a seller's knowledge of the defect is not relevant to establishing liability, cannot also establish a "known defect" for consumer fraud claims.

### 3. Importing Products Liability Design Defect Standards into Consumer Fraud Law Would Create Undesirable Incentives for Sellers, and Would Undermine Limitations on Products Liability Law.

Finally, allowing sellers to be held liable for consumer fraud based on allegations that a properly-functioning product was defective because there is a safer design would have at least several unfortunate consequences. First, in order to shield themselves from potential liability, sellers would have to disclose that the product lacked all other safer alternative design features. This goes far beyond the primary purpose of consumer fraud law, which is to prevent businesses from deceiving consumers, not to protect consumers from dangerous products. Also, to countenance such claims would obliterate the distinction between consumer fraud claims and failure-to-warn products liability claims, because, in effect, a seller could be held liable for mere economic loss for failure to disclose hazards of a product, even where the failure to disclose resulted in neither physical injury nor property damage—either of which is required to sustain a true products liability action. *See Kanter*, 99 Cal. App.4th at 790, 122 Cal.Rptr.2d 72 ("[u]nder the product liability law of California,

injury to the plaintiff from a defective product is an essential element of a cause of action," and "if the damage consists solely of economic losses, recovery on a products liability theory is unavailable.").

In summary, the design defect standards developed in the products liability context do not readily map to the consumer fraud context. Whether a product is defectively designed and therefore triggers a duty to disclose for purposes of consumer fraud actions cannot be coextensive with the retrospective, open-ended design defect tests of products liability law. This is apparent when the product in issue functions as designed. While the policy objectives underlying products liability law allow for a properly-functioning product to be deemed defectively designed in retrospect and regardless of the seller's knowledge, the policies animating consumer fraud law do not. This is borne out, at least implicitly, by the cases: Plaintiffs have not cited a single case allowing a plaintiff to pursue claims that a defendant engaged in fraud by not disclosing that a properly-functioning product lacked a certain safety feature that was not bargained for, the omission of which allegedly rendered the product defectively designed under products liability standards. Each and every case that Plaintiff relies on involved products that failed or malfunctioned in some way. *See supra*, pp. 23–24. By contrast, when the product functioned as designed and did not fail, consumer fraud claims were dismissed for lack of standing, for failure to plead a defect, or both. *See Birdsong*, 590 F.3d at 959, 96–962 (plaintiffs failed to plead that the iPods malfunctioned or "failed to do anything they were designed to do," and instead they "merely suggest[ed] possible changes to the iPod which they believe[d] would make the product safer" and they "failed to allege any cognizable defect."); *Taragan*, 2013 WL 3157918 at *5 ("claim of defect [was]

theoretical" where allegations were that properly-functioning keyless fob system posed increased rollaway risk, dismissing warranty and fraud claims). Although none of the cases explained why this is so, they do establish a pattern that the reasoning set forth above explains.

Ultimately, Plaintiffs have not articulated a precise legal theory of defect that accounts for the fact that the keyless fob systems work as designed, that they do not allege that they expected their vehicles to shut themselves off, that user error is a but-for cause of the risk, that it is common knowledge that vehicles left running in enclosed spaces can cause carbon monoxide poisoning, and that these are consumer fraud cases and not a products liability actions.

For the reasons discussed above, the Court concludes that the design defect jurisprudence developed in the products liability context is not transferable to the doctrinally distinct consumer fraud claims in this case. Because all of Plaintiffs' claims—which sound in consumer fraud law—rest on the premise that their vehicles' lack of Auto-Off constitutes a design defect under products liability standards, they have failed to articulate a plausible legal theory of defect applicable to *their* claims. Plaintiffs therefore lack of standing to pursue them.

The motions to dismiss for lack of standing are therefore **GRANTED**. Because the foregoing is dispositive of all of Plaintiffs' claims, the Court will not address the Automakers' other arguments.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs lack standing to bring their consumer fraud claims and therefore **GRANTS** all of the Automakers' Motions to Dismiss on that basis. This is Plaintiffs' second attempt to plead these claims against the Automakers. At oral argument,

Plaintiffs' counsel asked for leave to amend if the Court granted the motions, stating Plaintiffs could plead more facts to establish that the keyless fob systems are defectively designed under products liability standards. However, the Complaints recite abundant facts in this regard. The problem is that Plaintiffs' facts showing a design defect in the products liability realm do not also establish a design defect under the consumer fraud theories of liability that they invoke. Pleading more such facts would not cure the mismatch between Plaintiffs' design defect theories that sound in products liability law and their liability theories that sound in consumer fraud law. Accordingly, the Court **GRANTS** the Motions to Dismiss **without leave to amend**. These actions are hereby **DISMISSED**.